**In the Matter of PINETREE PARTNERS, LTD., Debtor.**

**PINETREE PARTNERS, LTD., Plaintiff,**

v.

**OTR, an Ohio General Partnership Acting on Behalf of the STATE TEACHERS RETIREMENT SYSTEM OF OHIO**

**and**

**State Teachers Retirement System of Ohio, Defendants.**

**Bankruptcy No. B84–00919.
Adv. No. B84–0552.**

United States Bankruptcy Court, N.D. Ohio.

April 28, 1988.

Marvin A. Sicherman, Dettelbach and Sicherman Co., L.P.A., Cleveland, Ohio, for plaintiff.

David C. Weiner, Mark S. Weisman, and Duane J. Deskins, of Hahn Loeser & Parks, Cleveland, Ohio, for defendants.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

JAMES H. WILLIAMS, Chief Judge.

Pinetree Partners, Ltd. (Pinetree), as debtor and debtor in possession, commenced the instant adversary proceeding against OTR and State Teachers Retirement System of Ohio (STRS)[1] wherein Pinetree seeks to subordinate or recharacterize the claims of OTR and the return of moneys paid by Pinetree to OTR. OTR denies both the factual and legal bases of Pinetree's allegations and has further alleged that Pinetree is equitably estopped by its conduct from raising these issues.

A four day trial was held at which time evidence was introduced and arguments of

---

1. The parties have stipulated that "for all purposes as relates to the within Adversary Proceeding, references, whether in the pleadings, briefs, or during the trial, to either OTR or STRS shall under the context be and mean either or both of them, despite their being separate entities." Accordingly all references to OTR hereinafter shall mean and include both and either OTR and STRS.

counsel were heard. Upon conclusion of the trial, the parties submitted to the court proposed findings of fact and conclusions of law.

### FACTS

1. Pinetree, an Ohio Limited Partnership, was formed in late 1982 to acquire real property consisting of land in Albuquerque, New Mexico, upon which five office buildings, known as the Pinetree Office Park (Project), are situated.

2. CIDCO Partners One (CIDCO), an Ohio General Partnership, is the sole general partner of Pinetree. Thomas P. Slavin (Slavin) and Robert Messing (Messing) are the sole general partners of CIDCO.

3. STRS manages a retirement fund created by the Ohio state legislature for the benefit of present and former Ohio teachers. Ohio Rev.Code Section 3307.01 *et seq.* OTR is an Ohio general partnership that was formed to facilitate investments of STRS.

4. In 1981, Slavin learned of the Project and subsequently became interested in purchasing it. The Project was then owned by Banco Mortgage Company (Banco) which had purchased it out of foreclosure. Banco was willing to sell the Project for $10,850,000.00.

5. In late 1981 or early 1982, Slavin met James Sublett, then the Executive Director of STRS. Slavin eventually sought funding from OTR, and to assist OTR with its pre-commitment due-diligence, Slavin furnished OTR with cash flow forecasts for several years' operations of the Project.

6. By letter dated April 14, 1982, Slavin made a proposal to OTR for it to finance the purchase of the Project. Slavin proposed "that you [OTR] serve as our mortgagee, with a 'step-up mortgage'; and secondly I am suggesting that you also serve in the capacity of land lessor."

7. On May 27, 1982, OTR delivered to Slavin a conditional letter of credit that provided, inter alia, that OTR would lend Pinetree $9,000,000.00 at 12.5% interest for a 25–year term, subject to conversion and call provisions. The offer also called for OTR to purchase the underlying real estate from Pinetree for $900,000.00 with a lease-back provision.

8. This offer was accepted by Slavin on May 28, 1982.

9. On August 27, 1982, Banco and Slavin, as nominee for Pinetree, executed a purchase agreement for the purchase of the Project. Pinetree agreed to pay Banco $10,850,000.00.

10. On August 27, 1982, OTR delivered to Pinetree, and Pinetree accepted, a commitment in writing with respect to the then contemplated transactions. (Pinetree Commitment).

11. On September 22, 1982, Pinetree simultaneously purchased the Project from Banco and closed the transaction with OTR. The transaction between Pinetree and OTR was carried out in accordance with the Pinetree Commitment.

12. On September 22, 1982, and as part of the closings, the following documents were executed by Pinetree and OTR:

a. Pinetree's promissory note in the sum of $9,000,000.00 payable to OTR.

b. Pinetree's mortgage and security agreement wherein Pinetree is the mortgagor/debtor and OTR the mortgagee/secured party.

c. Purchase agreement for real estate wherein Pinetree sells a portion of the Project, being the land but not the five buildings situated thereon, to OTR for $900,000.00.

d. Documents captioned Agreement of Lease wherein OTR leases the land to Pinetree.

e. Memorandum of lease for purposes of recordation of the ground lease from OTR to Pinetree which was filed for record in Bernalillo County, New Mexico on September 23, 1982.

f. Memorandum of a conversion option agreement filed for record in Bernalillo County, New Mexico on or about September 23, 1982.

g. Conversion option agreement wherein Pinetree granted to OTR the option to convert under the terms set forth therein

the mortgage loan from OTR to Pinetree to equity ownership in the Project.

h. Assignment of lessor's interest in leases wherein Pinetree assigned tenant leases with respect to occupants of the Project to OTR as security for the payment of the obligations of Pinetree to OTR, filed for record in Bernalillo County, New Mexico on or about September 23, 1982.

i. Indemnification agreement wherein Pinetree undertook to guarantee perspective improvements to the Project as provided therein.

j. Special warranty deed from Pinetree to OTR, wherein Pinetree conveyed that portion of the Project consisting of the underlying land to OTR, and which was recorded in Bernalillo County, New Mexico on September 23, 1982.

k. Financing statements filed for record with the clerk and recorder of Bernalillo County, New Mexico and the New Mexico Secretary of State within a few days after September 22, 1982.

13. The $950,000.00 balance of the purchase price for the Project was provided by a portion of a $1,400,000.00 interim loan from National City Bank (NCB).

14. The NCB interim loan was not secured by any assets of Pinetree and was to be paid off out of the funds generated by the syndication of limited partnership units.

15. The working capital provided by the NCB interim loan was thought to be sufficient to cover the operating deficiencies projected for the years 1982 and 1983. For the years after 1983, cash flow from the operation was projected to be sufficient to cover Pinetree's working capital needs for the Project.

16. The parties contemplated that after the closing on September 22, 1982, Pinetree would proceed to syndicate and sell limited partnership units.

17. The syndication of limited partnership units was commenced by Pinetree in December, 1982, and a Private Placement Memorandum was prepared and used for such purposes.

18. OTR was given access to a copy of the Private Placement Memorandum and an opportunity to comment thereon prior to syndication being commenced.

19. The syndication efforts continued through the first quarter of 1983 which resulted in the sale of 35 limited partnership units at a selling price of $66,500.00 per unit for an aggregate sum of $2,327,500.00, plus a nominal additional sum to be contributed by the general partner.

20. The purchasers of the limited partnership units were to pay the purchase price in five installments as follows: $7,000.00 upon subscription, and thereafter $27,500.00, $15,000.00, $12,000.00 and $5,000.00 on April 1st of the succeeding four years.

21. At the time of the closing, the existing tenant leases at the Project were "below market." The income generated was therefore not sufficient to permit Pinetree to pay the market rate of return on the funds it borrowed from OTR. The prime interest rate as of the closing date was approximately 13.5% per annum. The market interest rate for fixed rate return real estate loans was approximately 150 basis points (1.5%) per annum above the prime rate. Pursuant to the promissory note and ground lease, OTR was to receive a fixed return of 12.5% per annum. To induce OTR to make this below market rate loan, OTR received potential "kickers" in a "shared appreciation mortgage" so that in the event the Project was successful, OTR's return would increase.

22. Among provisions of the transaction documents between OTR and Pinetree were the following:

a. Pinetree was prohibited from engaging in any business other than the operation of the Project without the consent of OTR.

b. Pinetree was prohibited from constructing new buildings or additions to existing structures without the prior written consent of OTR.

c. Pinetree was prohibited from obtaining secondary financing or other borrowing without OTR's consent.

d. Pinetree was required to pay all closing costs and expenses plus up to $15,-000.00 of OTR's legal fees.

e. OTR possessed an absolute veto power with respect to cancellation, modification, or rental adjustments to any existing tenant lease.

f. All existing and prospective leases were to be approved by OTR and assigned to OTR.

g. OTR was entitled to 12.5% fixed interest plus 50% of the difference between the fair market value of the Project and the then outstanding principal balance of the loan on final payment of the promissory note.

h. The $9,000,000.00 loan was payable in monthly installments of $98,175.00 commencing October 1, 1982.

i. Pinetree was not permitted to prepay the loan prior to the 11th year.

j. Pinetree was required to obtain OTR's consent before selling its interest in the Project.

k. Pinetree was required to obtain OTR's consent before granting to any other party any lien or interest in and to Pinetree's rights in the Project.

l. The ground lease and mortgage both contained cross defaults so that a default by Pinetree under either was a default under both.

m. Pinetree was required to deliver to OTR monthly operating statements and an annual audited financial statement. Additionally, OTR had the right at all reasonable times to inspect books, records, plans, drawings and other documents applicable to the Project.

n. OTR had the right at all reasonable times to enter into and inspect the Project.

o. The ground lease between Pinetree and OTR was for 25 years, unless sooner terminated as provided in the lease.

p. Pinetree, as lessee, had no option to extend the term of the lease. Pinetree had the right to repurchase the land from OTR upon full amortization of the mortgage. The purchase price was to be the fair market value.

q. OTR was entitled to receive additional rent of 50% of the annual cash flow. Annual cash flow was defined as gross revenues minus permitted expenditures for each lease year.

r. Pinetree was prohibited from entering into leases or other agreements which were based on income or profits.

s. OTR had the option to convert the loan, beginning in the 8th year of the loan, to a 60% interest in Pinetree, thereby completely terminating the loan.

t. If OTR did not exercise the conversion option, it was permitted to call the promissory note due and payable at the end of the 11th year after giving Pinetree 12 months' notice.

u. Upon default, OTR had the right to select and require the employment of a managing agent for the Project.

23. OTR requested that as a part of the transaction, the operations of the racquet club and health spa located in the Project be severed, as OTR was concerned the facility would adversely impact on OTR's tax exempt status.

24. OTR had prior experience with participation mortgages that had "kickers."

25. Neither Slavin nor Pinetree's counsel prior to September 22, 1982, had any experience with mortgages containing "kickers."

26. Pursuant to the Pinetree Commitment and in connection with the closing of the loan, Pinetree provided OTR with an opinion of its counsel. This opinion provided, inter alia, that the loan documents were enforceable in accordance with their terms.

27. John McCarter, Senior Vice President of AmeriTrust with 25 years' experience in commercial lending, testified that the provisions in the mortgage and lease were customary and not unusual in real estate transactions financed by insurance companies or pension funds at that time.

28. While the loan documents contained the aforesaid provisions, *supra* pgs. 484–85, the evidence at trial showed that in practice they were of little or no significance in the dealings between Pinetree and OTR. The evidence showed:

(a) Pinetree never made any request for OTR's approval of secondary financing.

(b) OTR gave its consent to the only structural change requested. (E.F. Hutton expansion).

(c) OTR approved all leases presented by Pinetree.

(d) Pinetree made no request to sell its leasehold interest.

(e) The transaction was structured so that the health club property was not owned by Pinetree with the result that the rent under the ground lease would not be subject to unrelated business income under Section 512 of the Internal Revenue Code, 26 U.S.C. § 512.

(f) Pinetree did not seek to prepay the loan.

(g) OTR's visits to the Project were with Pinetree's knowledge and were at reasonable times.

(h) Even after default, OTR did not select a managing agent.

(i) Pinetree furnished routine financial information to OTR.

(j) OTR did not seek inspections of the books and records of Pinetree.

(k) OTR did not exercise its conversion option.

($l$) OTR received no additional interest, due to the poor performance of the Project.

(m) OTR received no additional rent, due to the poor performance of the Project.

(n) The eleventh year of the loan is not until 1993. Accordingly, OTR has never had the right to call the Loan.

29. The Private Placement Memorandum issued to potential limited partners contained a tax opinion from Pinetree's prior counsel which characterized the promissory note as debt and the relationship between OTR and Pinetree as not being a joint venture or partnership.

30. The Private Placement Memorandum also contained cash flow projections of the expected income from operations at the Project for the years 1982–1991. These projections show that Pinetree expected operating deficits for the years 1982 and 1983 and positive cash flow beginning in 1984. It was expected that the initial working capital would be sufficient to fund the operating deficits.

31. Consistent with the projected cash flow deficits for 1982 and 1983 the limited partners of Pinetree would receive a return on their investment by passing through tax benefits. This is what actually occurred with the limited partners taking deductions on their individual tax returns for the losses passed through to them.

32. Pinetree has carried the loan on its financial statements and federal tax returns as a mortgage loan for each year since the loan was made. Pinetree accrued the interest arising under the promissory note on its 1982 and 1983 audited financial statements. Pinetree has deducted interest expenses from operating income on its federal tax returns in each year since its inception regardless of whether such interest was actually paid. Similarly, the lease payments made by Pinetree to OTR under the ground lease have been deducted from Pinetree's operating income as rental expenses on its federal tax returns.

33. From and after September 22, 1982 through March 28, 1984, there were numerous meetings and telephone conversations between Slavin and representatives of OTR. The topic of these discussions concerned the status of syndication, tenant leases, prospective tenants, market conditions, operations and maintenance of the Project.

34. During 1983, as a result of being "over-built" without a corresponding increase in demand for office space, the Albuquerque, New Mexico commercial real estate market began a decline that adversely affected the Project. This decline was not expected by either party and has continued through 1987. As the Albuquerque market declined, Pinetree was unable to generate sufficient operating income from the Project to support the debt service and lease payments to OTR.

35. OTR was aware of the changing circumstances of the Albuquerque market which resulted in more favorable terms for tenants.

36. In April of 1983, Pinetree informed OTR of the possible need for the financing of expansion and tenant improvements of certain spaced leased by E.F. Hutton. OTR encouraged Pinetree to proceed with negotiations with Hutton regarding such expansion. The expected cost of such work was approximately $200,000.00. OTR informed Pinetree that it would consider the financing for the expansion.

37. During the time Pinetree was negotiating with E.F. Hutton, Pinetree was consistently in default under the loan documents and did not provide OTR with acceptable terms for the curing of such defaults and the repayment of the desired financing. Consequently, when asked by Pinetree to make an additional loan of $200,000.00 in December of 1983 for the proposed E.F. Hutton expansion, OTR refused.

38. In December of 1983, a tenant, Plateau, Inc. (Plateau), which was going out of business, informed Pinetree of its desire to terminate its long-term lease. Plateau and Pinetree entered into negotiations as to a buy-out by Plateau of its lease. OTR was aware of these negotiations and was kept informed of their status. OTR, however, did not become actively involved in these negotiations although it did have an opinion as to what would be an acceptable buy-out by Plateau.

39. At some point in time when the Plateau negotiations were being conducted, Santa Fe Mining (Santa Fe), another tenant, was seeking to consolidate its operations at the Project. Santa Fe had expressed some interest in the Plateau space. Plateau did not completely vacate the Project until mid–1984, Santa Fe found alternative space at another location in Albuquerque and moved out of the Project.

40. Even though OTR was to approve all lease agreements entered into between Pinetree and prospective tenants, OTR never informed Pinetree management as to general parameters that would be acceptable.

41. By mid-March, 1984, Pinetree was in substantial default under the promissory note and the ground lease. Payments were approximately $500,000.00 in arrears. As a result thereof, Slavin and Messing were asked to come to OTR's office in Columbus, Ohio. No disclosure was made to Slavin and Messing as to the purpose of this meeting or OTR's contemplated agenda of items to be discussed.

42. At the meeting on March 28, 1984, representatives of OTR, who were present with counsel, demanded Pinetree propose, within five days, a plan to bring current the arrearages under the promissory note and ground lease. OTR's Director of Investments, Stephen Mitchell, informed Slavin that unless satisfactory action was taken, OTR would initiate foreclosure proceedings. OTR had also prepared a deed in lieu of foreclosure which Slavin and Messing refused to sign.

43. On April 2, 1984, OTR filed a complaint against Pinetree in state court in New Mexico for foreclosure of the mortgage and security agreement. On April 9, 1984, Pinetree filed for relief under Chapter 11 of Title 11 thereby staying OTR's foreclosure proceedings.

44. Between September 22, 1982 and April 9, 1984, Pinetree paid to OTR approximately $1,625,300.00.

45. From April 10, 1984 through December 18, 1987, Pinetree paid to OTR approximately $1,386,100.00.

## OPINION

### A

### EQUITABLE SUBORDINATION

Pinetree, based upon the facts and evidence, requests the court to subordinate the claims of OTR. It is well established that a bankruptcy court has the authority to subordinate a claim on equitable grounds. *See, Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). This exercise of equitable jurisdiction has been codified in 11 U.S.C. § 510(c) which provides:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

■ Equitable subordination is an extraordinary remedy and certain conditions must be satisfied before the exercise of the subordination power becomes appropriate.

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In re Mobile Steel Company*, 563 F.2d 692, 699–700 (5th Cir.1977) (citations omitted); *In re Bell & Beckwith*, 44 B.R. 664 (Bankr. N.D.Ohio 1984); *In re Teltronics Services, Inc.*, 29 B.R. 139 (Bankr.E.D.N.Y.1983); *In re Pacific Express, Inc.*, 69 B.R. 112, 16 C.B.C.2d 286 (9th Cir.B.A.P.1986).

■ In applying the above tests, certain principles must be considered. First, the inequitable conduct need not have been related to the acquisition or assertion of the claim. Second, a claim should be subordinated only to the extent necessary to offset the harm which the debtor and its creditors suffered on account of the inequitable conduct. *In re Mobile Steel*, 563 F.2d at 701.

■ The burden is upon the objector to the claim to prove by a preponderance of the evidence that the claimant engaged in such substantial inequitable conduct to the detriment of the debtor's other creditors that subordination is warranted. *In re Teltronics*, 29 B.R. at 169; 3 Collier on Bankruptcy para. 510.05 (15th Ed.1987).

■ In applying equitable subordination, the creditor sought to be subordinated must: (a) have acted in a fiduciary capacity; (b) have breached a fiduciary duty; (c) that breach resulted in detriment to those claimants to whom a duty was owed; or, (d) committed an act of moral turpitude, causing damages to other creditors. *In re W.T. Grant Company*, 4 B.R. 53, 74 (Bankr.S.D.N.Y.1980) (citations omitted); affirmed 20 B.R. 186 (S.D.N.Y.); affirmed 699 F.2d 599 (2nd Cir.1983). Thus, the claims of fiduciaries, as well as those of non-fiduciaries, can be subordinated.

The primary distinctions between subordinating the claims of insiders versus those of non-insiders lies in the severity of misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions towards the debtor or its creditors. Where the claimant is a non-insider, egregious conduct must be proven with particularity. It is insufficient for the objectant in such cases merely to establish sharp dealings; rather, he must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of others. Where the claimant is an insider, his dealings with the debtor will be subjected to more exacting scrutiny. If the objectant comes forward with sufficient substantiations of misconduct on the part of the insider claimant, the burden will shift to the insider to establish that each of his challenged transactions with the debtor had all the earmarks of an arms-length bargain.

*In re Teltronics*, 29 B.R. at 169. (Citations omitted).

The court, before reaching the merits of the allegations, must first determine the status of OTR. Normally, a creditor is not a fiduciary of either the debtor or other creditors of the debtor and "owes them no special obligation of fidelity in the collection of his claims." *In re Teltronics*, 29 B.R. at 169. *In re W.T. Grant*, 699 F.2d at 609–610.

As was stated by the Seventh Circuit in *In re Prima Company*, 98 F.2d 952, 965 (1938):

Aside from the provisions of the bankruptcy law, a creditor has the right to

call a loan when due and to lawfully enforce collection. He may refuse an extension for any cause which may seem proper to him, or even without any cause. The law provides certain means for the enforcement of claims by creditors. The exercise of those rights is not inherently wrongful.

This general rule that a non-insider creditor is under no fiduciary obligation to its debtor or to other creditors is not without exception. "In the rare circumstances where a creditor exercises such control over the decision-making processes of the debtor as amounts to a domination of its will, he may be held accountable for his actions under a fiduciary standard." *In re Teltronics*, 29 B.R. at 170. A "non-insider creditor will be held to a fiduciary standard only when his ability to command the debtor's obedience to his policy directives is so overwhelming that there has been, to some extent, a merger of identity. Unless the creditor has become, in effect, the *alter ego*, he will not be held to an ethical duty in excess of the morals of the market place." *In re Teltronics*, 29 B.R. at 171; *In re Ludwig Honold Manufacturing Company, Inc.*, 46 B.R. 125, 128 (Bankr.E.D.Pa. 1985). "The creditor must exercise virtually complete control to be treated as a fiduciary." *In re Osborne*, 42 B.R. 988, 997 (W.D.Wis.1984).

■ In the instant proceeding, Pinetree asserts that OTR should be held to a fiduciary standard based on the control OTR exerted over Pinetree by virtue of: (1) the amount of financing; (2) the limitations in the loan documents; (3) the limitations in the ground lease; (4) the structure of the loan with its conversion options; and (5) the frequent meetings between Pinetree and OTR.

The court, however, does not reach this conclusion. The facts established at trial suggest that the rights OTR possessed, *supra*, 484–85, were not excessive in light of the nature of the transaction and did not place OTR in control of Pinetree.

The loan agreement and related transactions between OTR and Pinetree were entered into at arms-length. Both parties were willing participants to the transaction and no coercion was applied to either Pinetree or OTR to assent to the conditions and requirements in the loan documents. The fact that no other lender was available to Pinetree does not alter this arms-length characterization.

Additionally, the rights and restrictions which OTR possessed were never utilized to a point where it could be found that OTR virtually controlled Pinetree. *In re Osborne, supra.* In fact, most of the rights and powers held by OTR were never exercised. The management of Pinetree was, at all times, in control of the debtor and made the day to day decisions necessary for the operation of the business.

As for the numerous meetings between Pinetree and OTR, the actions of OTR can only be characterized as those of a cautious lender. The failure of OTR to monitor closely a $9,000,000.00 loan would be a dereliction of its duty to its own principals and creditors.

Accordingly, OTR's relationship with Pinetree did not transcend that of debtor and creditor, and OTR will not be held to a fiduciary standard.

Having determined that OTR is not a fiduciary of Pinetree, Pinetree must therefore show that OTR engaged in gross misconduct tantamount to fraud, overreaching or spoliation to the detriment of other creditors. *In re Teltronics, supra.*

■ Pinetree asserts that this burden has been met and equitable subordination is appropriate based on the nature of the transaction itself and OTR's conduct after the transaction was consummated.

As the court stated earlier, the transaction was negotiated between the parties at arms-length. Further, there is undisputed testimony before the court that the terms of the loan documents were common and ordinary for loans of this type, in light of the fixed rate of return being below the then current market rate.

The fact that the loan documents contained "kickers" that enabled OTR to share in any potential good fortune of Pinetree

does not in itself amount to inequitable conduct tantamount to fraud or overreaching. Additionally, the fact that OTR, through its representations, may have been a shrewd negotiator, again is not conduct amounting to fraud or overreaching.

As for OTR having access to Pinetree's books and records, requiring annual financial statements, and approval of rental leases and additional financing, these requirements can only be seen as those of a prudent lender protecting its interests. These rights possessed by OTR cannot be said to amount to gross misconduct on OTR's part.

Pinetree argued extensively at trial that it was undercapitalized at the time the transaction with OTR was entered into, and OTR knew of this undercapitalization. Consequently, it urges, OTR's knowledge and conduct supports subordination of its claims. The court, however, must find otherwise. Both Pinetree and OTR projected that the interim loan from NCB would provide enough working capital to sustain Pinetree until such time as the income from the operations would be sufficient to support the Project. Miscalculations by OTR as to the profitability of the Project is hardly conduct that can be characterized as inequitable and result in subordination. OTR, as a creditor of Pinetree, had nothing to gain by Pinetree being undercapitalized; just the opposite is true. OTR may not have thoroughly evaluated this transaction and may even have been slightly blinded by the prospects of a large return on its investment,[2] but its lack of analysis as to the Project's viability cannot be characterized as egregious conduct that was detrimental to other creditors.

Pinetree also asserts that OTR's denial of an additional $200,000.00 loan to finance the construction of the E.F. Hutton extension amounts to inequitable conduct. Pinetree further asserts that OTR's lack of guidance as to a reasonable settlement with Plateau resulted in the loss of Santa Fe as a tenant.

The evidence produced at trial simply does not support either of these assertions.

OTR was under no obligation to Pinetree, or other creditors, to extend additional financing. As the evidence reflected, Pinetree, at the time it requested the additional financing, was in substantial default of the original loan. OTR's refusal to extend additional money can only be construed to be cautious, not egregious, conduct.

As for settlement negotiations with Plateau, Pinetree was the appropriate party to conduct those negotiations. OTR may have been required to approve any settlement reached, but no settlement offer was communicated to OTR for which approval was requested. Additionally, if OTR had become directly involved in the settlement negotiations, this could be perceived as overreaching by a creditor.

As for the loss of Santa Fe as a tenant, besides the unexpected softening of the Albuquerque market, for which OTR was certainly not responsible, no evidence was presented to support a finding that OTR engaged in any conduct that forced Santa Fe to leave and was detrimental to other creditors of Pinetree.

Finally, Pinetree claims that because OTR met with Messrs. Slavin and Messing often and specifically demanded their presence in Columbus, Ohio, on March 28, 1984, at which meeting OTR threatened to foreclose upon its mortgage, it is guilty of "egregious conduct that is inequitable ..." The court finds, however, that such actions cannot support a claim for equitable subordination. Again, OTR's monitoring of its loan can only be seen, from the evidence presented to the court, to be that of a prudent lender. As for OTR threatening to foreclose, as previously stated, a creditor has a right to call a loan due and to lawfully enforce collection. *In re Prima, supra.*

Even if the court were to find the conduct of OTR to be egregious, no evidence has been presented by Pinetree to show that any other creditor relied to its detriment on any conduct by OTR. *In re W.T. Grant,* 4 B.R. at 74.

---

**2.** The court uses the word investment in its "generic sense" and in no way intends for it to be read any broader or for it to appear that the court finds OTR to have an equity investment.

Accordingly, the claims of OTR are not subject to equitable subordination pursuant to Section 510(c).

## B

## RECHARACTERIZATION

Pinetree alternatively asserts, for many of the same reasons given for its position that the claims should be subordinated, that OTR's claims should be recharacterized as an equity investment.

This issue was directly addressed in *In re Pacific Express, supra,* wherein the court held:

> Where the Code supports the court's ability to determine the amount and the allowance or disallowance of claims [11 U.S.C. § 502(a)], those provisions do not provide for the characterization of claims as equity or debt. The result achieved by such a determination, i.e. subordination, is governed by 11 U.S.C. § 510(c). Where there is a specific provision governing these determinations, it is inconsistent with the interpretation of the Bankruptcy Code to allow such determinations to be made under different standards through the use of the courts equitable powers. Although a bankruptcy court is essentially a court of equity, its broad equitable powers may only be exercised in a manner consistent with the provisions of the code.

*Id.* 69 B.R. 115, 16 C.B.C.2d at 290 (citations omitted).

■ This court agrees. The equitable powers of the court derive from the Bankruptcy Code and consequently reach no further than its provisions. Accordingly, the claims of OTR are not subject to recharacterization from debt to equity absent controlling provisions of the Bankruptcy Code. Section 510(c) *supra.*

## C

## EQUITABLE REFORMATION

■ Pinetree, in its complaint, also asserts that the loan documents should be reformed to change them from debt instruments to agreements evidencing equity in-terests. This argument was essentially abandoned by Pinetree at trial and therefore will be given only a brief discussion.

Under both New Mexico and Ohio law, a claimant must prove mutual mistake of both parties or a unilateral mistake coupled with fraud or inequitable conduct resulting in the written agreement not evidencing the true intention of the parties. *Buck v. Mountain States Investment Corporation,* 76 N.M. 261, 414 P.2d 491 (N.M.1966); *Castle v. Daniels,* 16 Oh.App.3d. 209, 475 N.E.2d 149 (Champaign County 1984).

No evidence was presented to the court that would support a finding that there was a mutual mistake of the parties or that the loan documents do not represent the true intention of the parties. To the contrary, the evidence shows that Pinetree, from the beginning, has carried the loan on its financial statements and federal tax returns as a mortgage loan. Pinetree has also deducted the interest expenses and the lease payments on its tax returns. Even with Pinetree's explanation that it has continued this practice so as to be consistent until a determination is made as to the realities of the transaction, the court can only conclude that when OTR and Pinetree entered into the transaction, both parties viewed it as a debtor-creditor relationship.

Accordingly, Pinetree's claim of equitable reformation is denied.

## D

## FRAUDULENT CONVEYANCE

■ Finally, Pinetree alleges that the sums of money paid to OTR prior and subsequent to September 22, 1982, which were in the nature of equipment fees, interest payments, principal and ground rent payments, are avoidable pursuant to 11 U.S.C. § 548(a) which provides:

> (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

The burden of proving that the conveyances were made under the conditions that bring it within Section 548 is upon Pinetree. 4 Collier on Bankruptcy, para. 548.10 (15th Ed.1987) (citations omitted).

The court need not belabor an analysis of this section in that it finds that Pinetree did receive reasonably equivalent value in exchange for such payments. Section 548(a)(2)(A) *supra.*

Value as defined in Section 548(d)(2)(A) provides that it includes "satisfaction or securing of a present or antecedent debt." The payments made by Pinetree to OTR were on account of an antecedent debt, which this court has ruled is a true debt. Additionally, the evidence presented at trial demonstrated that Pinetree received a loan of $9,000,000.00 at below market rates.

Accordingly, Pinetree's claim of fraudulent conveyance is denied.

### E

### EQUITABLE ESTOPPEL

In light of the courts ruling herein, the court need not address OTR's affirmative defense of estoppel.

## CONCLUSIONS OF LAW

In conclusion the court finds:

(1) OTR's claims are not subject to equitable subordination pursuant to 11 U.S.C. § 510(c).

(2) OTR's claims are not subject to recharacterization by the court from debt to equity, absent controlling provisions in the Bankruptcy Code.

(3) OTR's claims are not subject to equitable reformation.

(4) Pinetree did receive reasonably equivalent value for the transfers made to OTR, and therefore, the moneys paid are not avoidable as fraudulent transfers pursuant to 11 U.S.C. § 548(a).

An order in accordance herewith shall issue.

## ORDER

For the reasons set forth in the accompanying Memorandum of Decision, the court finds the complaint to subordinate alleged claims, determine such to be contributions to capital, invalidation, avoidance, or reformation of promissory note, ground lease, real estate deed, mortgage and security agreement, assignment of leases, enforcement of conversion agreement, and to recover funds paid, filed on behalf of the plaintiff, Pinetree Partners, Ltd. against the defendants, OTR and State Teachers Retirement System of Ohio, not to be well taken.

IT IS THEREFORE ORDERED that the complaint of the plaintiff, Pinetree Partners Ltd. against defendants, OTR and State Teachers Retirement System be, and the same hereby is, DISMISSED.

IT IS FURTHER ORDERED that each party shall bear its own costs in conjunction with this action.