**In re KIDS CREEK PARTNERS, L.P., Debtor.**

**David R. HERZOG, as Trustee of the Estate of Kids Creek Partners, L.P., Plaintiff,**

v.

**LEIGHTON HOLDINGS, LTD., Cecil R. McNab, Rafael Rios–Rodriguez, and Robin Schabes, Defendants.**

Bankruptcy Nos. 94 B 23947, 95 A 00158.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Sept. 26, 1996.

Steven Shamash, David A. Belofsky & Assoc., Chicago, IL, for Plaintiff Trustee.

David R. Herzog, Layfer Cohen & Handelsman, Chicago, IL, Plaintiff Trustee.

Neal L. Wolf, Janet S. Baer, Schwartz Cooper Greenberger & Krauss, Chicago, IL, for Defendants Leighton Holdings and Cecil R. McNab.

Rafael Rios, Chicago, IL, pro se.

## MEMORANDUM OPINION

JACK B. SCHMETTERER, Bankruptcy Judge.

This adversary proceeding relates to the involuntary bankruptcy case filed against Kids Creek Partners, L.P. ("Debtor") under Chapter 7 of the Bankruptcy Code, Title 11 U.S.C. The Chapter 7 Trustee David R. Herzog filed an Adversary Complaint seeking orders to equitably subordinate the claim of Defendant Leighton Holdings, Ltd. ("Leighton") (Count I); to recharacterize the Debtor's obligation to Leighton as equity (Count II); to find that Leighton breached its contract with the Debtor (Count III); to find that Defendant Cecil R. McNab ("McNab") breached his fiduciary duty to the Debtor (Count IV); to find that Defendant

Rios also breached his fiduciary duty to the Debtor (Count V); and to find that McNab induced Rios and former Defendant Robin Schabes ("Schabes") to breach their respective fiduciary duties to the Debtor (Count VII).[1] Defendants Leighton and McNab have moved for summary judgment on Counts I, II, III, IV, and VII of the First Amended Complaint, and Defendant Rios has moved for summary judgment on Count V. The pleadings, exhibits, affidavits, and statements of the parties filed in accordance with Local Bankruptcy Rule 402.M and .N have been considered. For reasons discussed below, the two motions are denied.

## JURISDICTION

This matter is before the Court pursuant to 28 U.S.C. § 157 and is referred to the bankruptcy court under Local General Rule 2.33(A) of the Northern District of Illinois. Venue is proper pursuant to 28 U.S.C. § 1409. Subject matter jurisdiction lies under 28 U.S.C. § 1334(b). Counts I and II constitute core proceedings under 28 U.S.C. § 157(b)(2)(O). The remaining counts in issue here constitute non-core proceedings that are otherwise related to this bankruptcy case pursuant to 28 U.S.C. § 157(c)(1).

## SUMMARY JUDGMENT STANDARDS

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. Rule 56(c); Fed.R.Bankr.P. 7056. A court may render summary judgment upon the whole case or only a portion thereof. Fed.R.Civ.P. 56(e). Partial summary judgment is available where it disposes of at least one count of a complaint. *Commonwealth Ins. Co. of N.Y. v. O. Henry Tent & Awning Co.*, 266 F.2d 200, 201 (7th Cir. 1959); *Quintana v. Byrd*, 669 F.Supp. 849, 850 (N.D.Ill.1987).

The moving party bears the initial burden of demonstrating that no genuine issues of

---

1. Pursuant to this Court's order entered March 8, 1996, Count VI of the First Amended Complaint has been dismissed and Defendant Schabes is no longer a defendant in this action.

material fact exist and that judgment should be granted in its favor as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The movant must inform the court of the basis for its motion and identify those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Id.* There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

The Court must view the underlying facts in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14; *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355–56. The existence of a material factual dispute is sufficient to prevent summary judgment if the disputed fact is determinative of the outcome under applicable law. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

### Overview of the Trustee's Allegations

Over the course of 1993, the Debtor and Leighton entered into four "Loan and Security Agreements" through which Leighton agreed to provide the working capital the Debtor needed to develop the Commons. Pursuant to these Loan and Security Agreements, the Limited Partnership Agreement of the Debtor was amended twice. The First Amended Complaint alleges that, pursuant to one of these agreements, the shareholders of Mainstream entered into a shareholder's agreement ("Mainstream Shareholder's Agreement"). First Amended Complaint at ¶ 29(2). The Trustee argues that the voting restrictions in the Mainstream Shareholder's Agreement and the redistribution of the partnership interests of the Debtor were inequitably set in place to afford Leighton and McNab the opportunity to take over the Debtor and the Commons Redevelopment Project. Furthermore, the Trustee alleges that, when the Defendants' plan to gain control over the operation failed, they inequitably and for improper reasons refused to continue to provide Debtor with the necessary capital to continue the project, thereby precipitating the Debtor's involuntary bankruptcy. The Trustee requests the Court, therefore, to equitably subordinate the claim of Leighton (Count I); to recharacterize this debt to Leighton as equity (Count II); to find that Leighton's ultimate failure to continue providing funds to the Debtor constitutes a breach of contract and to compensate the Debtor for damages sustained as a result of that breach (Count III); to find a breach of fiduciary duty by McNab (Count IV) and Rios (Count V), and to compensate the Debtor's estate for injuries sustained as a result of their respective misconduct; and to find that McNab induced Rios and Schabes to breach their respective fiduciary duties and, as such, require McNab to further compensate Debtor's estate for injuries sustained as a result of these breaches induced by McNab (Count VII).

### *UNCONTESTED FACTS*

From filings by the parties, the following are found to be facts that are undisputed and not in substantial controversy unless otherwise specified (in ¶¶ 17, 23, 25, 26, 30, 34, 44, 46, 49, 55, 59, 61, 62, 63, 64, 66, 68, 70, 74, and 76, setting forth matters that remain in controversy):

### I. The Parties

1. David R. Herzog ("Trustee") is the trustee for the estate of the Debtor. The Debtor is a limited partnership formed under the laws of the State of Michigan. The Debtor was formed by Carl Groesbeck ("Groesbeck"), an Illinois resident, for the purpose of acquiring and developing a parcel of real estate in Traverse City, Michigan ("Commons Development Project"), commonly referred to as the Grand Traverse Commons ("Commons"). *See* Leighton & McNab 402.M Statement ¶ 1 and answer thereto. The Commons comprises roughly 500 acres and previously served as the site of a Michigan state psychiatric hospital and facilities.

2. The general partner of the Debtor was Kids Creek Development Company

("KCDC"), a Michigan corporation.[2] Leighton & McNab 402.M Statement ¶ 2 and answer thereto; Rios 402.M Statement ¶ 5 and answer thereto. Groesbeck was the president of KCDC. Leighton & McNab 402.M Statement ¶ 23 and answer thereto; Rios 402.M Statement ¶ 6 and answer thereto. KCDC was a "shell" corporation in that all of its common stock was owned by Mainstream Development Corporation ("Mainstream"). Leighton & McNab 402.M Statement ¶ 3 and answer thereto; Rios 402.M Statement ¶ 7 and answer thereto.

3. Mainstream was an Illinois corporation that maintained its principal offices near Chicago, Illinois.[3] Groesbeck was the president, director, and held the largest number of shares of common stock of Mainstream. Groesbeck, Rios, Andrew McGhee ("McGhee"), and Schabes were officers and/or directors of both KCDC and Mainstream. Leighton & McNab 402.M Statement ¶ 4 and answer thereto; Rios 402.M Statement ¶ 8, 9 and answer thereto.

4. Defendant McNab is an attorney who at all times mentioned here was a Los Angeles resident. McNab was also a 50% shareholder in a corporation known as "Del Rey Financial" ("Del Rey"). Trustee's Consolidated Statement of Additional Facts ¶ 29 and Leighton & McNab's answer thereto. McNab is also an agent for Leighton, which is a Cayman Islands Corporation. Leighton & McNab 402.M statement ¶ 19 and answer thereto.

5. Defendant Rios, a resident of Chicago, Illinois, is the Harvard Law School schoolmate and friend of McNab. He and McNab presently refer to each other as "closest" friends. From the time they met in 1981 or 1982, they have spoken regularly, "sometimes every day for weeks at a time." Rios and McNab remained in regular contact with each other throughout the time they were active in the Commons Development Project. Trustee's Consolidated Statement of Additional Facts ¶ 28 and Leighton & McNab's answer thereto. Rios acted as the attorney for the Debtor as to matters in Chicago dealing with Leighton.

6. Schabes, an Illinois resident, is a friend and business colleague of Rios. Rios met Schabes in late 1986 or 1987 when Rios hired Schabes to work for him at the City of Chicago as a planning coordinator. Rios contacted Schabes and told her about his potential involvement in the Commons Development Project on or about September 16, 1992, and in his initial discussions with Groesbeck, Rios told Groesbeck that he intended to work with Schabes on the Project. *See* Trustee's Consolidated Statement of Additional Facts ¶¶ 31 & 32 and Leighton & McNab's answer thereto.

7. Andrew Connor is an attorney who was hired by Rios to represent McNab and Leighton in the transactions with the Debtor. *See* Trustee's Consolidated Statement of Additional Facts ¶ 70–71 and Leighton & McNab's answer thereto. At that time, Connor was a partner at Winston & Strawn. *See* Trustee's Consolidated Statement of Additional Facts ¶ 70 and Leighton & McNab's answer thereto. Connor had been one of the partners for whom Rios had previously worked at Reuben and Proctor, another Chicago law firm. *See* Trustee's Consolidated Statement of Additional Facts ¶ 70 and Leighton & McNab's answer thereto.

8. Lakeside Partners ("Lakeside") is a partnership organized under the laws of California. There exists no written partnership agreement with respect to Lakeside. *See* Trustee's Consolidated Statement of Additional Facts ¶ 2 and Leighton & McNab's answer thereto. It is undisputed that McNab is a partner in Lakeside. Leighton & McNab 402.M Statement ¶ 19 and answer thereto. The Trustee also alleges that Leighton is a partner of Lakeside, although this fact is disputed. Lakeside, McNab, and Leighton will hereinafter be collectively referred to as the "McNab Interests."

9. Richard R. Murray ("Murray"), an Illinois resident, is an attorney licensed to practice in Illinois. Murray is the president and sole shareholder of Ross Development Com-

---

2. KCDC is also the debtor in a related Chapter 7 bankruptcy case.

3. Mainstream is currently a debtor in a related Chapter 7 bankruptcy case.

pany ("Ross"), an Illinois Corporation. Murray and Ross have filed a lawsuit in the Circuit Court of Cook County, Illinois, County Department—Chancery Division ("Murray Litigation"). Trustee's Consolidated Statement of Additional Facts ¶ 19 and answer thereto. Andrew McGhee is a limited partner in the Debtor, and a shareholder, officer, and director of Mainstream. *See* First Amended Complaint ¶ 13 and answer thereto.

10. Grand Traverse Commons Redevelopment Corporation ("GTCRC") is a Michigan corporation formed by a civic group from Traverse City, Michigan on or about June 26, 1991. *See* Trustee's Consolidated Statement of Additional Facts ¶ 17 and Leighton & McNab's answer thereto.

## II. The Land Development Project

11. During the summer or early fall of 1992, Groesbeck and Mainstream, together with Murray and Ross began the Commons Development Project. Over the course of 1992, these persons and entities exchanged several letters and proposed agreements that purportedly set forth the respective rights and obligations of the parties. However, the existence and terms of any binding agreement between any of these parties is disputed in the Murray Litigation.[4] *See* Trustee's Consolidated Statement of Additional Facts ¶ 19 and answer thereto.

12. During the last half of 1992, Groesbeck created three separate entities to participate directly or indirectly in the Commons Development Project. In September 1992, Groesbeck caused both Mainstream and KCDC to be incorporated.

13. Sometime later, Groesbeck created the Debtor. Trustee's Consolidated Statement of Additional Facts ¶ 22 and Leighton & McNab's answer thereto. These three entities ("Kids Creek Entities") were capital-

ized with the minimum capitalization required by law. Trustee's Consolidated Statement of Additional Facts ¶ 23.

14. During the late summer and fall of 1992, Mainstream and Groesbeck attempted to identify sources of funding for the early phases of the project. Groesbeck attempted to attract both equity investors and lenders for the Commons Development Project. *See* Trustee's Consolidated Statement of Additional Facts ¶ 24 and Leighton & McNab's answer thereto.

15. On or about September 15, 1992, Groesbeck met with Rios at Rios' office. At that meeting, Groesbeck described to Rios his proposed development plan for the Commons site. Groesbeck represented that he had already entered into an agreement with people in control of the Commons Development Project and that he needed funding to get things under way. Trustee's Consolidated Statement of Additional Facts ¶ 26 and Leighton & McNab's answer thereto.

16. On or about September 20, 1992, Rios and Schabes traveled to Traverse City, Michigan, to visit the Commons. While in Traverse City, they met with several people, including Suzanne Antosh, the Chair of the GTCRC. Trustee's Consolidated Statement of Additional Facts ¶ 33 and Leighton & McNab's answer thereto.

17. The Trustee alleges that at this meeting Ross was described as a representative of an unidentified private investor. Leighton and McNab dispute this allegation. Trustee's Consolidated Statement of Additional Facts ¶ 38 and Leighton & McNab's answer thereto.

18. At that time, Rios understood that GTCRC would purchase the Commons from the State of Michigan for one dollar, and would transfer the property to a developer on the condition that the developer would

---

4. The Murray Litigation was brought in an Illinois state court against Groesbeck, the Debtor, Mainstream, and others, including Rios, Leighton, McNab, and Robert C. Camp ("Camp"). In that lawsuit, Ross and Murray allege that Mainstream and Groesbeck breached their respective fiduciary duties owed to Ross and Murray as joint venturers in the Commons Development Project. They further allege that Groesbeck and

Mainstream breached their obligations under this alleged joint venture agreement with Ross and Murray. The Murray Litigation also includes a number of other allegations against each of the Debtors, including claims of unjust enrichment, fraud, conversion of personal property, interference with contract, and interference with prospective economic advantage.

perform certain obligations under a redevelopment agreement with GTCRC. Trustee's Consolidated Statement of Additional Facts ¶ 35 and Leighton & McNab's answer thereto. Rios also understood that any developer would need to successfully perform "pre-development" activities, including urban planning of the Commons, obtaining the appropriate zoning and building permits, analyzing and accounting for traffic, and creating a redevelopment plan consistent with the historic nature of the property. *See* Trustee's Consolidated Statement of Additional Facts ¶ 36 and Leighton & McNab's answer thereto.

19. Both Rios and Groesbeck attempted to obtain financing for the Commons Development Project but to no avail. Lenders were not interested in the project because it was unsecured and high risk. Trustee's Consolidated Statement of Additional Facts ¶¶ 42–44 and Leighton & McNab's answer thereto. Even Rios considered the Commons Development Project to be high risk because its success at that time was still contingent on a number of factors, including whether the Michigan Legislature would authorize a transfer of the Commons real estate to GTCRC and whether the proposed redevelopment plan would be accepted by the GTCRC. Trustee's Consolidated Statement of Additional Facts ¶ 45 and Leighton & McNab's answer thereto.

20. On December 2, 1992, Mainstream entered into a Development Services Agreement with Ross, the Illinois Corporation controlled by Murray. Under the Development Services Agreement, Ross was to provide certain consulting services for which Mainstream was to pay Ross an annual fee of $100,000. Mainstream was also to reimburse Ross for out of pocket expenses. This Development Services Agreement was a two year commitment. Trustee's Consolidated Statement of Additional Facts ¶ 50 and Leighton & McNab's answer thereto.

21. Also on December 2, 1992, GTCRC entered into an Exclusivity Agreement with the Debtor. The Exclusivity Agreement provided that, among other things, for a period of six months, the Debtor would enjoy the exclusive right to propose a redevelopment plan for the Commons Development Project, lobby the Michigan legislature to enact the requisite legislation to transfer the Commons to GTCRC, and negotiate with GTCRC concerning the form and content of a formal redevelopment agreement. *See* Trustee's Consolidated Statement of Additional Facts ¶ 51 and Leighton & McNab's answer thereto. Murray was then designated the Debtor's "Project Representative" who was to be the agent for the Debtor. The Exclusivity Agreement specifically provided that it would be assumed that Murray would be in continuous contact with all other KCP principals, partners, and other team members. *See* Trustee's Consolidated Statement of Additional Facts ¶ 53 and Leighton & McNab's answer thereto.

22. In late December 1992, McNab traveled to Michigan to view the Commons and meet with some of the key players in the project, including Groesbeck and McGhee. While in Michigan, Groesbeck and several other people described the Commons Development Project, showed McNab the Commons site, informed him of the Exclusivity Agreement, and provided him with financial projections for the Debtor. Trustee's Consolidated Statement of Additional Facts ¶ 58 and Leighton & McNab's answer thereto.

23. The Trustee also alleges that during this trip, McNab told Groesbeck that he would not arrange to finance the Commons Project unless Rios and Schabes were made shareholders and directors of Mainstream. McNab asserts that he did not make financing contingent upon Rios and Schabes becoming shareholders and directors of Mainstream. Trustee's Consolidated Statement of Additional Facts ¶ 61 and Leighton & McNab's answer thereto.

24. At that time, McNab was told that the Debtor had none of its own capital to use to comply with the Exclusivity Agreement. Rios was likewise unaware of any other capital contributions available to enable the Debtor perform under the Exclusivity Agreement. Trustee's Consolidated Statement of Additional Facts ¶¶ 67 & 70 and Leighton & McNab's answer thereto.

25. However, the Trustee alleges that during this trip Groesbeck informed McNab that he and Mainstream had borrowed money from two parties—Robert Camp ("Camp") and Thomas Sourlis ("Sourlis")—to finance previous Commons Development Project Activities. Leighton and McNab deny this allegation. Trustee's Consolidated Statement of Additional Facts ¶ 61 and Leighton & McNab's answer thereto.

26. The Trustee further alleges that McNab told Groesbeck that he was making an equity investment that had to be characterized as a loan for "unspecified tax reasons." McNab denies this assertion. In fact, McNab asserts that he and Groesbeck at this time did not discuss whether McNab was an agent for a potential source of funds, that McNab never told Groesbeck that Leighton would make any investment other than a loan, and asserts that the terms of the loan initially set the interest rate at fifteen percent, which was Leighton's standard rate for loans at that time. Trustee's Consolidated Statement of Additional Facts ¶ 61(g) and Leighton & McNab's answer thereto.

27. By January 1993, Rios was an officer and director of Mainstream, and an officer and director of KCDC. Rios was also a principal and owner of Mainstream, which meant that Rios was also effectively in control of the Debtor. See Trustee's Consolidated Statement of Additional Facts ¶ 72 and Leighton & McNab's answer thereto. From the facts presented to the Court to date, it is unclear how Rios obtained his ownership interest in Mainstream, or for what consideration.

28. On January 16, 1993, Groesbeck, McGhee, Rios, and Schabes signed the Mainstream Development Company Shareholders Agreement ("Shareholders Agreement"). See Trustee's Consolidated Statement of Additional Facts ¶ 77 and Leighton & McNab's answer thereto. The Shareholders Agreement stated that McGhee owned 24.5%, Rios and Schabes each owned 12.25%, and Groesbeck owned the remainder of the outstanding shares. Trustee's Consolidated Statement of Additional Facts ¶ 79(a) and Leighton & McNab's answer thereto. It also stated that Rios, Schabes, McGhee, and Groesbeck were the directors and that either Rios or Schabes could veto any amendment to the governing documents of Mainstream and its subsidiaries and could also veto modifications to loan agreements or increases in capital of Mainstream and its subsidiaries. See Trustee's Consolidated Statement of Additional Facts ¶ 78(b) & (c) and Leighton & McNab's answer thereto. None of these veto powers were given to either Groesbeck or McGhee. See Trustee's Consolidated Statement of Additional Facts ¶ 78(d) and Leighton & McNab's answer thereto. Furthermore, a 76% super majority was required to authorize certain corporate actions, including the power to borrow more than $100,000 or guaranty any obligation. Trustee's Consolidated Statement of Additional Facts ¶ 78(e) and Leighton & McNab's answer thereto. This latter provision, in effect, guaranteed that if Rios and Schabes voted together against such an action, they could effectively block it because their combined shares totaled 24.5%.

29. It is uncontested that Groesbeck would not have permitted either Rios or Schabes to participate unless Rios had managed to arrange financing. Trustee's Consolidated Statement of Additional Facts ¶ 81 and Leighton & McNab's answer thereto. It is also uncontested that McNab would not have arranged for financing unless Rios was a part of the project. Trustee's Consolidated Statement of Additional Facts ¶ 82 and Leighton & McNab's answer thereto.

30. The Trustee alleges that from the beginning Rios informed Groesbeck that he was acting on behalf of a potential investor, "a friend in Los Angeles," whom Groesbeck later learned to be McNab. Trustee's Consolidated Statement of Additional Facts ¶ 27. The Trustee further alleges that both Rios and Groesbeck told Murray that Rios was acting on behalf of McNab. Id. These allegations are contested by the Defendants. The Trustee further alleges that, as early as October 1992, Murray had met with Groesbeck regarding the Commons Development Project and that Groesbeck told Murray that Rios represented a venture capital fund. Trustee's Consolidated Statement of Additional Facts ¶ 39 and Leighton & McNab's

answer thereto. Leighton and McNab also deny this representation.

## III. The Loan Agreements

31. On January 21, 1993, the parties executed documents in connection with a Loan and Security Agreement ("LASA One"). Trustee's Consolidated Statement of Additional Facts ¶ 85 and Leighton & McNab's answer thereto; Rios 402.M Statement ¶ 15 and answer thereto. Groesbeck, in his capacity as president of KCDC, signed the agreement, and McGhee, in his capacity as secretary of KCDC, attested to it. Rios 402.M Statement ¶ 22 and answer thereto. LASA One provided for Leighton to loan the Debtor $350,000. Rios 402.M Statement ¶ 15 and answer thereto. LASA One required that Lakeside Partners was to be given an 11.67% limited partnership interest in the Debtor. Trustee's Consolidated Statement of Additional Facts ¶ 87(d) and Leighton & McNab's answer thereto; Rios 402.M Statement ¶ 15 and answer thereto. LASA One also required that Leighton "was to be satisfied" that Rios and Schabes each had been provided a 12.25% equity interest in Mainstream. Trustee's Consolidated Statement of Additional Facts ¶ 87(e) and Leighton & McNab's answer thereto. Furthermore, KCDC, Groesbeck, and Mainstream each guaranteed the Debtor's payment obligations. Trustee's Consolidated Statement of Additional Facts ¶ 87(f)-(h) and Leighton & McNab's answer thereto. As additional security for the loans, Groesbeck was to furnish a mortgage to Leighton on all real property owned by him, and the Debtor was to assign to Leighton all rights to proceeds. Trustee's Consolidated Statement of Additional Facts ¶ 87(i) & (j) and Leighton & McNab's answer thereto.

32. In addition, LASA One required the Debtor to provide Leighton with various financial information. Leighton was to receive financial statements and balance sheets of the Debtor, KCDC, Mainstream, and Groesbeck as of January 15, 1993. Trustee's Consolidated Statement of Additional Facts ¶ 87(k) and Leighton & McNab's answer thereto. These were provided to Leighton on January 20, 1993. *Id.* Leighton was also to be provided with a "pro forma" balance sheet as of February 1, 1993, "after giving effect to the consummation of the transactions contemplated by the GTCRC Agreement and this Agreement." Trustee's Consolidated Statement of Additional Facts ¶ 87(*l*) and Leighton & McNab's answer thereto. In exchange, Leighton provided a special covenant that it would "cause an entity with a net worth of $4 million or more (which may be the Lender or an affiliate of the Lender) to become associated with the Borrower." Trustee's Consolidated Statement of Additional Facts ¶ 87(s) and Leighton & McNab's answer thereto.

33. The financial information actually provided to Leighton included the following information: (a) the January 15, 1993 financial statement for the Debtor, which reflected "current assets" of $685.89; (b) the Debtor's "pro forma" statement for February 1, 1993, which corroborated the assets listed in the Debtor's January 15, 1993, statement; (c) Mainstream's January 15, 1993 financial statement, which reflected a $2706.61 bank account as Mainstream's largest asset; (d) Mainstream's February 1, 1993, "pro forma" financial statement, which reflects a $57,-206.61 checking account balance. Trustee's Consolidated Statement of Additional Facts ¶ 88 and Leighton & McNab's answer thereto.

34. Of the foregoing, Leighton and McNab only dispute the assertion that Mainstream's January 15, 1993, financial statement reflected the $2706.61 balance in a bank account as Mainstream's largest asset. *Id.*

35. The Trustee alleges that the January 15, 1993, financial statement for Mainstream also included "current liabilities" for $57,000 in loans. Trustee's Consolidated Statement of Additional Facts ¶ 88(vi) and Leighton & McNab's answer thereto. The Trustee asserts that this loan reflects Mainstream's obligation to Camp and Sourlis. Trustee's Consolidated Statement of Additional Facts ¶ 88(viii) and Leighton & McNab's answer thereto. Leighton and McNab dispute these assertions and instead assert that the June 30, 1993, balance sheet for Mainstream reflects no loans from banks and only $17,000 in loans from officers of Mainstream. Trust-

ee's Consolidated Statement of Additional Facts ¶ 88(vi) and Leighton & McNab's answer thereto. The January 15, 1993, balance sheet for Mainstream does, in fact, reflect a $57,000 loan outstanding as a "current liability." Leighton & McNab Reply Brief in Support of Motion for Summary Judgment, Exhibit B. There is no further information on that balance sheet regarding the source of that debt.

36. Although, by its terms, LASA One was to be secured by a mortgage on Groesbeck's real estate, McNab permitted the initial advance of $190,500 under LASA One to be disbursed without such a mortgage in place, instead relying on an undocumented "side deal" with Groesbeck. Trustee's Consolidated Statement of Additional Facts ¶ 91 and Leighton & McNab's answer thereto. Leighton conducted no title search to determine the priority of its contemplated mortgage interest nor did McNab seek an appraisal of the value of Groesbeck's property. Trustee's Consolidated Statement of Additional Facts ¶ 92 and Leighton & McNab's answer thereto. Furthermore, although by its terms LASA One required Groesbeck to provide a guaranty of KCP's obligations, Leighton did not obtain a credit report on Groesbeck and McNab had no information on Groesbeck's personal finances. Trustee's Consolidated Statement of Additional Facts ¶ 93 and Leighton & McNab's answer thereto.

37. Also on January 21, 1993, the parties executed an Amended and Restated Limited Partnership Agreement which was prepared and executed pursuant to LASA One. Trustee's Consolidated Statement of Additional Facts ¶ 94 and Leighton & McNab's answer thereto; Rios 402.M Statement ¶¶ 26 & 27 and answer thereto. This agreement was executed by Groesbeck, in his capacity as a limited partner in the Debtor and president of KCDC, and Lakeside. Rios 402.M Statement ¶ 32 and answer thereto. Pursuant to that agreement, Lakeside received an 11.67% interest in the Debtor as the sole "Special Limited Partner." The stated consideration was $116.70. Trustee's Consolidated Statement of Additional Facts ¶ 96(a) and Leighton & McNab's answer thereto; Rios 402.M

Statement ¶ 28 and answer thereto. This Special Limited Partnership interest was not subject to dilution without the Lakeside's consent. Trustee's Consolidated Statement of Additional Facts ¶ 96(c) and Leighton & McNab's answer thereto. Furthermore, pursuant to this agreement, the Debtor's net profits had to be used first to pay down the debt owed to Leighton and the Special Limited Partner was entitled to an 11.67% cash flow from "subsequent projects," which meant "Commons projects subsequent to master planning." Trustee's Consolidated Statement of Additional Facts ¶ 96(d & e) and Leighton & McNab's answer thereto.

38. On January 25, 1993, Murray met with Groesbeck and Rios at Mainstream's Chicago offices. In his affidavit, Murray described in detail what he observed. Murray asserts in that affidavit that he had "no doubt, based on what [he] observed, that [Rios] was representing Mr. McNab and that he and Mr. McNab were controlling Groesbeck." Trustee's Consolidated Statement of Additional Facts ¶ 99 and Leighton & McNab's answer thereto. Leighton, McNab, and Rios dispute the affidavit.

39. On February 18, 1993, the Debtor and Leighton entered into an agreement that amended LASA One by increasing the amount of Leighton's loan to the Debtor to $28,240 and issued Lakeside an additional 1% partnership interest in the Debtor. Rios 402.M Statement ¶¶ 34 & 35 and answer thereto.

40. On April 19, 1993, McNab faxed Rios a letter (to Mainstream's Chicago Office) for the expressed purpose of complying with Leighton's obligation under LASA One to "cause an entity worth $4 million to become associated with the Borrower." Trustee's Consolidated Statement of Additional Facts ¶ 122 and Leighton & McNab's answer thereto. In that letter, McNab attached an account summary from the Bermuda Trust Company that showed Leighton's cash holdings in excess of $4 million. The letter also describes the relationship between Leighton and the Debtor. McNab made the following representation: "Leighton Holdings, Ltd. is a partner in Lakeside Partners Limited Partnership. Trustee's Consolidated Statement

of Additional Facts ¶ 123 and Leighton & McNab's answer thereto.

41. On or about May 26, 1993, Rios faxed McNab a letter with financial projections for the project. Trustee's Consolidated Statement of Additional Facts ¶ 141 and Leighton & McNab's answer thereto. The letter contained the following representation: "[the Debtor] is consciously attempting to keep the level of outside participation to a minimum. To that end, it is our thought that we would limit equity investment, after your investment of $500,000, to the CCRC (continuing care retirement communities) and ITC (investment tax credit) investors." Trustee's Consolidated Statement of Additional Facts ¶ 141(c) and Leighton & McNab's answer thereto.

42. On June 17, 1993 the parties entered into a second loan agreement ("LASA Two"), which more than doubled the amount originally invested in the Commons Development Project. This new agreement provided, among other things, that Leighton would make two advances totaling $522,000, one payable immediately and the second payable upon satisfaction of certain tasks of the Commons Development Project and upon Leighton being granted a first priority perfected mortgage lien on the owner's interest in the Commons. Trustee's Consolidated Statement of Additional Facts ¶ 146 and Leighton & McNab's answer thereto; Rios 402.M Statement ¶ 42 and answer thereto. LASA Two also provided that Lakeside would receive 12.5% of Mainstream's stock. Trustee's Consolidated Statement of Additional Facts ¶ 146 and Leighton & McNab's answer thereto; Rios 402.M Statement ¶ 42 and answer thereto. Lakeside would further receive an additional 10.573% of the Debtor's limited partnership shares. Trustee's Consolidated Statement of Additional Facts ¶ 146 and Leighton & McNab's answer thereto; Rios 402.M Statement ¶ 42 and answer thereto. Furthermore, pursuant to LASA Two, McNab would receive .846% of the limited partnership shares in the Debtor and 1% of the outstanding stock in Mainstream. Trustee's Consolidated Statement of Additional Facts ¶ 60 & 62 and Leighton & McNab's answer thereto. Pursuant to LASA Two,

Del Ray, the entity in which McNab had a 50% interest, was to be paid a $22,000 "fee."

43. At approximately the same time as LASA Two was executed, the Debtor and GTCRC succeeded in obtaining the Michigan Legislature's approval to convey the Commons to GTCRC in exchange for nominal consideration, so that the real estate could eventually be developed in accordance with the Redevelopment Agreement. First Amended Complaint and Rios' Answer thereto.

44. The pleadings suggest that by this time the Kids Creek Entities were contemplating a sale of a portion of the Commons ("Medical Campus") to Munson Healthcare and the County of Grand Traverse (collectively "Munson and County"), although when negotiations began regarding this sale is unclear. *See, e.g.,* First Amended Complaint ¶¶ 42, 45.

45. On June 24, 1993, McGhee sent McNab financial statements for Mainstream and the Debtor. Trustee's Consolidated Statement of Additional Facts ¶ 149 and Leighton & McNab's answer thereto. These financial statements disclosed that Mainstream had an account receivable of $60,000 and that the Debtor had an account payable of $60,000. Trustee's Consolidated Statement of Additional Facts ¶ 150 and Leighton & McNab's answer thereto.

46. The Trustee asserts that the foregoing entries were intended to disclose that Mainstream was paying the Debtor's project expenses, using the Debtor's funds, although McNab denies that he understood this to be the case. *Id.* Furthermore, McNab does not recall reviewing these financial statements nor asking anyone about them. Trustee's Consolidated Statement of Additional Facts ¶ 151 and Leighton & McNab's answer thereto.

47. On June 30, 1993, the parties executed the First Amendment to the Amended and Restated Partnership Agreement for the Debtor ("First Amended Partnership Agreement"). Rios 402.M Statement ¶ 51 and answer thereto. Pursuant to this Agreement, Rios, Schabes, and McGhee for the first time received limited partnership interests in the

Debtor. Lakeside and McNab were also provided with limited partnership interests as specified by LASA Two. Trustee's Consolidated Statement of Additional Facts ¶ 152 and Leighton & McNab's answer thereto; Rios 402.M Statement ¶ 52 and answer thereto. Lakeside and McNab assert that the percentages in this agreement did not exactly correlate to the percentages set out in LASA two. Trustee's Consolidated Statement of Additional Facts, ¶ 152 and answer thereto.

48. Prior to September 1993, the Debtor attempted to sponsor a private placement offering ("PPO") to raise $2 million in equity. Trustee's Consolidated Statement of Additional Facts ¶ 160 and Leighton & McNab's answer thereto.

49. The Trustee asserts that Rios then informed Groesbeck that McNab "would take it," meaning that he would take the chance to fund $2 million in exchange for additional equity in the project. Leighton and McNab deny this assertion. Trustee's Consolidated Statement of Additional Facts ¶ 161 and Leighton & McNab's answer thereto. The Trustee further asserts that Groesbeck thought he could not further market the PPO because Leighton had been granted a right of first refusal on February 18, 1993, but that is also denied. *Id.*

50. On September 3, 1993, GTCRC and the Debtor entered into a "Master Lease" for the Commons to take effect once GTCRC received title from the State of Michigan. Trustee's Consolidated Statement of Additional Facts ¶ 124 and Leighton & McNab's answer thereto. Although the Master Lease was executed on September 3, 1993, GTCRC did not receive title until December 1993. First Amended Complaint ¶ 58 and Leighton, McNab and Rios' answers thereto.

51. On September 30, 1993, the parties entered into a third amended loan and security agreement ("LASA Three"), which again amended the previous agreements. Rios 402.M Statement ¶ 58 and answer thereto. This agreement accelerated the timetable for funding the second advance granted under LASA Two so that advance could be made even though a mortgage on the Commons project had not yet been approved. Trust-

ee's Consolidated Statement of Additional Facts ¶ 163 and Leighton & McNab's answer thereto; Rios 402.M Statement ¶ 59 and answer thereto. As a condition of this funding, LASA Three required that Lakeside's interest in Mainstream be increased to 13% and that Lakeside's interest in the Debtor be increased to 24%. Trustee's Consolidated Statement of Additional Facts ¶ 165 and Leighton & McNab's answer thereto.

52. On November 2, 1993, the parties entered into the fourth and final loan and security agreement ("LASA Four"). Pursuant to this agreement Leighton was to lend an additional $2 million to the Debtor in periodic advances according to a specified schedule. Rios 402.M Statement ¶ 65 and answer thereto. This brought Leighton's total lending commitment to $2.9 million. The agreement further provided for the Debtor to repay the obligation in one year, except that any profits from a land sale would have to be first applied to retire the Leighton debt, regardless of whether the loan was otherwise due. Trustee's Consolidated Statement of Additional Facts ¶ 172 and Leighton & McNab's answer thereto.

53. In addition, LASA Four provided that Lakeside's limited partnership interests in the Debtor would increase to 19.88%, bringing Lakeside's aggregate limited partnership interest in the Debtor to 32.88%, which was greater than the amount owned by any other entity, including Groesbeck. Trustee's Consolidated Statement of Additional Facts ¶ 172(d) and Leighton & McNab's answer thereto. In addition, McNab owned .76% of the limited partnership interest in the Debtor and 1% of the shares of Mainstream. *Id.*

54. From each of the foregoing advances, McNab was to receive a 4% finder's fee, from each $80,000 loan installation Leighton made to the Debtor. Trustee's Consolidated Statement of Additional Facts ¶ 172(e) and Leighton & McNab's answer thereto.

## IV. The Alleged Breach and Foreclosure

55. On December 1, 1993, Jack Burns, an appraiser commissioned by the Debtor and Munson and County to appraise land values for the contemplated Medical Campus sale,

appraised the subject real estate at $6.3 million. Trustee's Consolidated Statement of Additional Facts ¶178 and Leighton & McNab's answer thereto. Although Leighton and McNab admit that this appraisal was done, they object to the accuracy of the $6.3 million figure. They assert that the appraisal did not take into account the restrictions on the property in terms of development opportunities, the cost of the infrastructure, or the cost of demolition. *Id.* The real estate value remains in issue.

56. On December 9, 1993, pursuant to agreements with Leighton, Debtor granted Leighton a mortgage on its interest in the Commons, and GTCRC executed a "joinder agreement" with respect to the mortgage. Trustee's Consolidated Statement of Additional Facts ¶179 and Leighton & McNab's answer thereto. The "joinder agreement" provided that the "[m]ortgagee, or any purchaser at the foreclosure sale will take title to the Premises subject in all respects to: (I) the Redevelopment Agreement with respect to compliance with applicable zoning; and (ii) the ARP and the Act 250 Development Plan ... and will assume the financial and insurance obligations of the Mortgagor under the Master Lease...." *Id.* The mortgage was subsequently recorded on December 14, 1993. *Id.*

57. On December 14, 1993, McGhee faxed McNab a request for the final advance under both LASA Two and LASA Three (totaling $322,000) and the second advance under LASA Four (totaling $272,400). Trustee's Consolidated Statement of Additional Facts ¶180 and Leighton & McNab's answer thereto. On December 15, 1993, McNab directed Leighton's bank to wire $559,943 to the Debtor, to comply with the funding request made by McGhee the previous day. Trustee's Consolidated Statement of Additional Facts ¶181 and Leighton & McNab's answer thereto.

58. Later in December, McNab visited Mainstream's offices for the first time. The Trustee alleges that during this visit McNab and McGhee had a conversation that Groesbeck overheard. McNab and Leighton do not deny that this conversation took place. Trustee's Consolidated Statement of Additional Facts ¶183 and Leighton & McNab's answer thereto. In McGhee's affidavit, McGhee asserts that McNab told him Lakeside required a $500,000 distribution from the profits of the Medical Campus sale to Munson and County over and above repayment of the Leighton obligations. *Id.* McGhee further asserted in his affidavit that he told McNab this would not be possible, because such a distribution would require a commensurate distribution to the other limited partners, which would leave insufficient funds for continued development. *Id.* McGhee's assistant performed a calculation as to such a distribution and his assistant verified that it would, in fact, leave inadequate funds for future development. Trustee's Consolidated Statement of Additional Facts ¶184.

59. Commencing on December 22, 1993, the Trustee claims that Connor and Helen Shapiro, another attorney for Leighton, along with Rios and McNab, conferred and worked together in drafting a real estate contract for the Debtor's contemplated sale of the Medical Campus to Munson and County. Trustee's Consolidated Statement of Additional Facts ¶182 and Leighton & McNab's answer thereto. Leighton and McNab deny that Shapiro and Connor helped draft the document, and assert that they only conferred, reviewed documents, and met with Rios and others in an attempt to help Rios draft the document. *Id.*

60. The Trustee alleges that, as of December 31, 1993, the Commons Project was under budget for compensation to principals, according to the budget specified in LASA One. Trustee's Consolidated Statement of Additional Facts ¶185 and Leighton & McNab's answer thereto. Leighton and McNab deny this assertion. Also on December 31, 1993, McGhee sent McNab checks totaling $25,319, which represented interest payments. Trustee's Consolidated Statement of Additional Facts ¶186 and Leighton & McNab's answer thereto. In addition, McGhee sent McNab a letter requesting $268,400, which represented the January 1, 1994 scheduled funding (gross) of the "private placement funding." *Id.*

61. The Trustee further alleges that to this point Rios had never informed Groesbeck or McGhee that any of the Kids Creek Entities had to conduct their affairs differently to comply with the Leighton agreements. Leighton and McNab contest this assertion and argue that it was McGhee's— and not Rios'—responsibility to determine whether the Kids Creek Entities were incompliance with the agreements. Trustee's Consolidated Statement of Additional Facts ¶ 187 and Leighton & McNab's answer thereto. The Trustee also alleges that Groesbeck asked Rios for summaries of the agreements on more than one occasion in 1993 and that Rios told him not to worry about what the documents said. Leighton and McNab deny these conversations ever took place and again assert that it was McGhee's responsibility to determine whether the Kids Creek Entities were in compliance with the agreements. Trustee's Consolidated Statement of Additional Facts ¶ 188 and Leighton & McNab's answer thereto. In his deposition, McNab stated that he could not recall a single instance in 1993 when he notified any of the Kids Creek Entities that the loan agreements with Leighton had been violated because they had failed to provide financial statements as required by the agreement, although for several months they had not been provided. Trustee's Consolidated Statement of Additional Facts ¶ 190 and Leighton & McNab's answer thereto.

62. The Trustee alleges that on or about December 30, 1993, Rios, McNab and Connor met privately and that at this meeting Rios told Connor and McNab he was concerned that the Debtor was in breach of its agreements with Leighton because the Debtor owed $15,000 to Camp. Leighton and McNab dispute the characterization of this meeting and what was discussed. In response, they assert that the concern was with the fact that Camp's claim was convertible into an equity interest in the project. Trustee's Consolidated Statement of Additional Facts ¶ 191 and Leighton & McNab's answer thereto. They further assert that just prior to this meeting the Debtor's principals had informed McNab of Camp's claim for the first time. *Id.*

63. On January 10, 1994, Connor appeared at Mainstream's offices to present a "draft" default notice ("Default Threat"). Connor testified in his deposition that at this meeting he first learned of the debt to Sourlis. Trustee's Consolidated Statement of Additional Facts ¶ 192 and Leighton & McNab's answer thereto. The Trustee asserts that in this default threat Leighton never mentioned the failure to provide financial statements, but that the default threat instead refers only to the Murray Litigation, the debt to Camp, and "excessive compensation." Trustee's Consolidated Statement of Additional Facts ¶ 193 and Leighton & McNab's answer thereto. The Trustee further asserts that Leighton has never specified the amount of the alleged overcompensation. *Id.* Leighton and McNab deny this assertion and state that it was not only the debt to Camp but also the claim of Camp that he had an interest in the Project which concerned Leighton. *Id.*

64. The Trustee further alleges that on January 14, 1994, during a telephone conversation, McNab told Groesbeck that McNab would cause Leighton to foreclose unless Groesbeck turned over control of the Debtor to McNab and Rios. Trustee's Consolidated Statement of Additional Facts ¶ 195. Leighton and McNab deny that McNab, on that date or at any other time, made such a statement. Trustee's Consolidated Statement of Additional Facts ¶ 195 and Leighton & McNab's answer thereto.

65. On January 29, 1994, ten days after Connor served the Default Threat, Groesbeck sent McNab a four page letter and attachments that contained a summary of his proposal to bring the Kids Creek Entities into compliance with the agreement. Trustee's Consolidated Statement of Additional Facts ¶ 196 and Leighton & McNab's answer thereto.

66. The Trustee contends that in that letter Groesbeck proposed that the Debtor would either repay Camp and Sourlis in full or take actions to protect Lakeside's equity interests from dilution and to indemnify Lakeside for any potential legal expenses in the event that Camp and Sourlis would not accept full repayment and litigation ensued.

Trustee's Consolidated Statement of Additional Facts ¶ 197(a) & (b). Leighton and McNab interpret the letter differently and deny the Trustee's interpretation, contending that the letter merely offered to issue revised notes and that Debtor would only indemnify Lakeside if funding from Leighton could initially be used and reimbursed. Trustee's Consolidated Statement of Additional Facts ¶ 197(a) & (b) and Leighton & McNab's answer thereto.

67. However, it is undisputed that the letter also proposed to reorganize the "internal management structure to go to a vertical management system ..." and to provide McNab with a copy of this proposal. Trustee's Consolidated Statement of Additional Facts ¶ 197(d) and Leighton & McNab's answer thereto. It is also undisputed that the letter further proposed to require joint signatures on all bank accounts for all checks over $500, with the signatures of either Rios or Schabes being required, and to change the by-laws so that contracts or commitments that required a potential expenditure of $1,000 or more would require the signatures of either Rios or Schabes to be valid. Trustee's Consolidated Statement of Additional Facts ¶ 197(e) and Leighton & McNab's answer thereto. On January 20, 1994, the Debtor sent a similar letter to that sent by Groesbeck. Trustee's Consolidated Statement of Additional Facts ¶ 198 and Leighton & McNab's answer thereto.

68. On February 1, 1994, in response to the letters from Groesbeck and counsel for the Debtor, Connor sent Groesbeck a letter on behalf of Leighton. The Trustee asserts that this letter agreed to Groesbeck's proposals as to Camp, Sourlis, and the protection of Lakeside's equity interests, although Leighton and McNab assert that through the letter Leighton merely agreed to work out the Camp and Sourlis situations under certain terms and conditions somewhat different from those proposed by Groesbeck. Trustee's Consolidated Statement of Additional Facts ¶ 199(a) and Leighton & McNab's answer thereto. This letter also specified certain requirements for financial controls and reporting to Leighton and proposed that Leighton would obtain a security interest in all of Mainstream's assets, including all its KCDC stock. Trustee's Consolidated Statement of Additional Facts ¶ 199(b) & (c)(ii) and Leighton & McNab's answer thereto. The letter also contained several other proposals, although the parties disagree as to their actual intent.

69. On February 7, 1994, the Debtor's attorney sent Connor a letter in response to Leighton's proposals outlined in the February 1, 1994, letter. Trustee's Consolidated Statement of Additional Facts ¶ 200 and Leighton & McNab's answer thereto. This letter attempted to explain to Leighton the process by which and the reasons why Mainstream had been paying the Debtor's expenses, using funds of the Debtor, and why this arrangement was beneficial to all. Trustee's Consolidated Statement of Additional Facts ¶ 201(a) and response thereto. Furthermore, the letter stated that all personal property purchased with Leighton's funds would be pledged as security for the Leighton loans. Trustee's Consolidated Statement of Additional Facts ¶ 201(b) and Leighton & McNab's answer thereto. The letter affirmed the parties' prior agreement that certain transactions would require the authorization of both Rios and Schabes. Trustee's Consolidated Statement of Additional Facts ¶ 201(c) and Leighton & McNab's answer thereto. The letter reflected disagreement, however, over Leighton's demand for the restructuring of ownership of the Kids Creek Entities and suggested that the remaining proposals already made were sufficient to address any legitimate concerns of Leighton. Trustee's Consolidated Statement of Additional Facts ¶ 201(d) and Leighton & McNab's answer thereto. In support of this, the letter took note of the fact that Leighton already appeared to be over secured. Trustee's Consolidated Statement of Additional Facts ¶ 201(d) and Leighton & McNab's answer thereto. The letter further noted that despite the recent problems with Leighton, the Debtor had successfully continued the Commons Development Project and had drafted a district plan for zoning approval during that period. Trustee's Consolidated Statement of Additional Facts ¶ 201(3) and Leighton & McNab's answer thereto.

70. Numerous discussions were then held to resolve the dispute between Leighton and the Kids Creek Entities. Trustee's Consolidated Statement of Additional Facts ¶ 202 and Leighton & McNab's answer thereto. The Trustee asserts that the Debtor's attorney believed an agreement had been reached when he left for a short trip in March, although Leighton and McNab deny this assertion. *Id.* The Trustee further alleges that during this period Rios and Schabes stopped working on the Commons Development Project. Trustee's Consolidated Statement of Additional Facts ¶ 203. Leighton and McNab, however, assert that Rios and Schabes worked throughout February and then discovered in March or April that Groesbeck and McGhee were paying themselves more than they were paying Rios and Schabes, in direct violation of previous agreements. Trustee's Consolidated Statement of Additional Facts ¶ 203 and Leighton & McNab's answer thereto. Leighton and McNab further allege that when Rios and Schabes confronted Groesbeck and McGhee with this disparity, the latter parties canceled Rios and Schabes' company credit cards, locked their computer files, changed the locks on the office doors and moved the offices without telling either Rios or Schabes. *Id.*

71. In March 1994, because of Leighton's continued refusal to reinstate funding, the Debtor missed its first interest payment to Leighton. Trustee's Consolidated Statement of Additional Facts ¶ 204 and Leighton & McNab's answer thereto. Thereafter, on May 26, 1994, Leighton served the Debtor with a default notice ("Default Notice"). Trustee's Consolidated Statement of Additional Facts ¶ 205 and Leighton & McNab's answer thereto. This Default Notice listed the following as the events of defaults: (a) monetary defaults commencing March 1994; (b) alleged non-disclosure of liabilities to Camp and Sourlis; (c) the fact that the Murray Litigation persisted "despite verbal notice that it was material;" (d) the allegation that Mainstream had paid principals' salaries in excess of amount permitted; and (e) the Debtor's failure to provide monthly financial statements. *Id.*

72. Groesbeck then hired an attorney, Gary Weintraub ("Weintraub"), to represent him and the Debtor in response to the Default Notice. Trustee's Consolidated Statement of Additional Facts ¶ 206 and Leighton & McNab's answer thereto. This was the first attorney that represented the Debtor who had not formerly been a colleague of Connor and Rios. *Id.* On June 9, 1993, Weintraub wrote a letter to Connor and McNab in which Weintraub contends that Leighton was in default under its funding commitments and that the alleged defaults of the Debtor were illegitimate, having no bases in law or fact. Trustee's Consolidated Statement of Additional Facts ¶ 207 and Leighton & McNab's answer thereto.

73. On June 13, 1994, McGhee wrote McNab a "group of letters" requesting that Leighton fund the scheduled LASA Four advances for February through May 1994, for an aggregate of $939,200. Trustee's Consolidated Statement of Additional Facts ¶ 208 and Leighton & McNab's answer thereto. Thereafter on June 16, 1994, Groesbeck sent McNab and Connor a letter that purported to exercise the Debtor's option under LASA Two to extend that loan's repayment date by six months. Trustee's Consolidated Statement of Additional Facts ¶ 209 and Leighton & McNab's answer thereto.

74. Leighton and McNab assert, however, that because "Matured and Unmatured Events of Default" existed, the Debtor could no longer exercise said option. *Id.*

75. Throughout July and August, several letters were exchanged by the parties, but no resolution was reached. As a result, on August 18, 1993, McNab sent Groesbeck a notice of default and recorded same against the Commons real estate. Trustee's Consolidated Statement of Additional Facts ¶ 213 and Leighton & McNab's answer thereto. On September 30, 1993, Leighton filed a complaint seeking to foreclose on its Mortgage. Trustee's Consolidated Statement of Additional Facts ¶ 214 and Leighton & McNab's answer thereto. In that suit, Leighton alleged as events of default those listed on the May 26, 1994, notice of default and also the defaults in subsequent months for non-payment of interest.

76. The Trustee alleges that the complaint represents as defaults the supposedly "concealed equity claims" of Murray, Camp, and Sourlis, but that these representations are false because neither Camp nor Sourlis asserted equity claims in the Debtor and the loans to Camp and Sourlis were expressly disclosed to Leighton. *Id.* Leighton and McNab dispute these assertions and counter that the complaint's allegations are true. *Id.*

77. Despite this ongoing dispute between the Kids Creek Entities and Leighton, the negotiations for the sale of the Medical Campus continued from April 1994 to November 1994. Trustee's Consolidated Statement of Additional Facts ¶ 215 and Leighton & McNab's answer thereto. Thereafter, on December 5, 1994, Murray filed involuntary Chapter 7 petitions against the Debtor, Mainstream, and KCDC. Trustee's Consolidated Statement of Additional Facts ¶ 219 and Leighton & McNab's answer thereto. On December 12, 1994, Munson and County filed an emergency motion in the bankruptcy court to appoint a Chapter 7 trustee so the Medical Campus sale could be completed by the Trustee. Trustee's Consolidated Statement of Additional Facts ¶ 221 and Leighton & McNab's answer thereto.

78. On December 15, 1994, Groesbeck and McGhee sent Rios and Schabes a letter that proposed certain corporate actions and informed them that they were attempting to have the Kids Creek Entities' bankruptcies converted to voluntary Chapter 11 proceedings. Trustee's Consolidated Statement of Additional Facts ¶ 222 and Leighton & McNab's answer thereto. On December 21, 1994, Connor, the attorney for Leighton (and not Rios or Schabes), responded that the proposed Chapter 11 petitions would constitute actions outside the scope of Groesbeck and McGhee's authority as shareholders of the debtor. Trustee's Consolidated Statement of Additional Facts ¶ 223 and Leighton & McNab's answer thereto.

79. On December 21, 1994, the Trustee filed and served a motion before this Court for authority to complete the Medical Campus sale for $2,874,144. The motion was noticed for December 30, 1994. Trustee's Consolidated Statement of Additional Facts

¶ 224 and Leighton & McNab's answer thereto. On December 27, 1994, Groesbeck and McGhee filed a motion that requested additional time to respond to the involuntary bankruptcy petitions while they negotiated with other shareholders regarding a possible voluntary Chapter 11 petition. Trustee's Consolidated Statement of Additional Facts ¶ 226 and Leighton & McNab's answer thereto. On December 28, 1994, Rios and Schabes filed with this Court a pleading that opposed the relief sought by Groesbeck and McGhee and argued that Groesbeck and McGhee could not act without their consent pursuant to the Shareholder's Agreement. Trustee's Consolidated Statement of Additional Facts ¶ 227 and Leighton & McNab's answer thereto. Thereafter, on December 30, 1993, the Court entered orders for relief as to the Debtor, Mainstream, and KCDC which indicated the Debtors had filed no response to the involuntary petitions. Trustee's Consolidated Statement of Additional Facts ¶ 228 and Leighton & McNab's answer thereto; Rios 402(M) Statement ¶ 1 and answer thereto. At that time, the Court also granted the Trustee's motion to complete the Medical Campus sale. Trustee's Consolidated Statement of Additional Facts ¶ 229 and Leighton & McNab's answer thereto.

80. On January 20, 1995, using a portion of the sale proceeds, the Trustee transferred by wire a total of $2,098,469.41 to the accounts of Winston & Strawn, for payment of their fees on behalf of Leighton, and to Leighton, as payment of its allegedly secured claim. Trustee's Consolidated Statement of Additional Facts ¶ 230 and Leighton & McNab's answer thereto. These funds were transferred on the condition that Leighton post a letter of credit to assure repayment to the estate in the event that the Trustee prevailed in his adversary complaint against Leighton. *Id.*

Other matters in issue are set forth in the Discussion that follows.

### DISCUSSION

#### Count I: Equitable Subordination

In Count I of the First Amended Complaint, the Trustee alleges that Leighton, through the conduct of McNab, engaged in

various inequitable actions sufficient to warrant the equitable subordination of Leighton's claim to other creditors. Section 510 of the Bankruptcy Code governs the subordination of claims. The Court may

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

Section 510(c) codified a set of common law principles developed under the former Bankruptcy Act to determine when equitable subordination was appropriate. *In re Virtual Network Services Corp.*, 902 F.2d 1246, 1248–49 (7th Cir.1990); *see also Collier on Bankruptcy*, ¶ 510.01.

Shortly before enactment of the Bankruptcy Code and the current section 510(c), the Fifth Circuit collected and summarized authorities on the subject and identified the necessary conditions of equitable subordination. *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 698–700 (5th Cir. 1977). The *Benjamin* opinion found three conditions that must be satisfied before a court may exercise the power of equitable subordination: (a) the creditor must have engaged in some type of inequitable conduct, (b) the misconduct must have resulted in injury to other creditors of the estate or conferred unfair advantage on the creditor, and (c) equitable subordination must not be inconsistent with other provisions of the Act. *Id.* at 699–700 (citations omitted).

Since enactment of the Code, this three prong standard has been widely adopted by courts as the proper test for equitable subordination under section 510(c). *See, e.g., Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1351, n. 13 (7th Cir.1987), *cert. denied*, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988) (noting that the test has been adopted by many courts as the standard formulation); *Unsecured Creditors' Committee v. Banque Paribas (In re Heartland Chemicals, Inc.)*, 136 B.R. 503, 516 (Bankr.C.D.Ill.1992); *Badger Freightways, Inc. v. Continental Illinois National Bank and Trust Co. (In re Badger Freightways)*, 106 B.R. 971, 976 (Bankr.N.D.Ill.1989) (Schmetterer, J.). The inquiry into facts warranting equitable subordination has been made on a case-by-case basis and focuses on fairness to the other creditors. *In re Envirodyne Industries, Inc.*, 79 F.3d 579, 581 (7th Cir.1996); *In re Vitreous Steel Products Co.*, 911 F.2d 1223, 1237 (7th Cir.1990).

■ Equitable subordination sometimes serves as a redress to the efforts of corporate insiders to convert their equity interests into secured debt in anticipation of bankruptcy. *See Kham & Nate's Shoes No. 2, Inc. v. First Bank*, 908 F.2d 1351, 1356 (7th Cir.1990) (Easterbrook, J.) (citing *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939)). Whether a creditor's conduct is deemed inequitable under section 510(a) depends on the nature of the legal relationship between the debtor and the creditor whose claim is subject to attack on equitable subordination grounds. *Badger Freightways*, 106 B.R. at 976.

Although equitable subordination is most frequently encountered when the creditor is guilty of some misconduct, the Seventh Circuit has approved of equitable subordination without fault. *See Virtual Network Services*, 902 F.2d at 1250. In *Virtual Network Services*, the Seventh Circuit determined that inequitable conduct is not an indispensable requirement of the three prong test, stating that:

> Congress intended the courts to "develop" the "principles of equitable subordination." We further conclude, as did the district court, that the principles of equitable subordination are broader than the doctrine which developed prior to § 510(c)(1)'s enactment. It is clear that in principle, equitable subordination no longer requires, in all circumstances, some inequitable conduct on the part of the creditor.

*Virtual Network Services*, 902 F.2d at 1249–50.

Other courts in this circuit have subsequently noted that in certain circumstances inequitable conduct need not be shown. *En-*

*virodyne,* 79 F.3d at 581; *Vitreous Steel,* 911 F.2d at 1237; *Walker v. Ferguson (In re Import & Mini Car Parts, Ltd., Inc.),* 136 B.R. 178, 181 (Bankr.N.D.Ind.1991); *De'Medici v. Salson Express Company (In re Lifschultz Fast Freight),* 191 B.R. 712 (N.D.Ill.1996). Two other circuits have adopted this line of reasoning. *See Burden v. United States,* 917 F.2d 115, 120 (3d Cir. 1990); *Schultz Broadway Inn v. United States,* 912 F.2d 230, 233 (8th Cir.1990).

### A. Status of Creditor as Fiduciary or Insider

In most equitable subordination cases, the creditor owes a fiduciary obligation to the debtor and the debtor's other creditors. Typically the creditor has been an officer or director of a corporate debtor and often a controlling shareholder. The Supreme Court has stressed the need "to sift the circumstances surrounding any claim to see that injustice or unfairness is not done" is particularly acute when the creditor owes a fiduciary duty to the debtor. *Pepper,* 308 U.S. at 307, 60 S.Ct. at 246.

 Where the creditor owes a fiduciary duty to the debtor, the court will equitably subordinate the fiduciary's claim unless the fiduciary can show that the transaction that gave rise to the contested claim carried "the earmarks of an arm's length bargain" *Id.* at 306, 60 S.Ct. at 245. This is because the creditor-fiduciary cannot "utilize his inside information and his strategic position for his own preferment." *Id.* at 311, 60 S.Ct. at 247. The creditor-fiduciary then has the burden of proof to show that such a transaction was concluded in good faith and was inherently fair to the debtor and other interested parties. *Pepper,* 308 U.S. at 305, 60 S.Ct. at 244. However, this high level of scrutiny should not "discourage those most interested in a corporation from attempting to salvage it through an infusion of capital...." *Mobile Steel,* 563 F.2d at 701.

If a claimant is not a fiduciary, its claim may still be equitably subordinated, but courts have required the claimant's conduct to be much more egregious. *Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.),* 29 B.R. 139, 169 (Bankr.E.D.N.Y. 1983); *see also Kham & Nate's Shoes,* 908 F.2d at 1356–57; *Heartland Chemicals,* 136 B.R. at 517. "It is insufficient for the objectant in such cases merely to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to 'fraud, overreaching or spoliation to the detriment of others.'" *Teltronics,* 29 B.R. at 169.

 A corporation engaged in lending such as Leighton does not ordinarily owe fiduciary obligations to the customers to whom it lends. *Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 609 (2d Cir.), *cert. denied, Cosoff v. Rodman,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *Pinetree Partners, Ltd. v. OTR (In re Pinetree Partners),* 87 B.R. 481, 489 (Bankr.N.D.Ohio 1988). As a Seventh Circuit panel observed long ago:

> Aside from the provisions of the bankruptcy law, a creditor has a right to call a loan when due and to lawfully enforce collection. He may refuse an extension for any cause which may seem proper to him, or even without any cause. The law provides certain means for the enforcement of claims by creditors. The exercise of those rights is not inherently wrongful.

*Harris Trust & Savings Bank v. Keig (In re Prima Co.),* 98 F.2d 952, 965 (7th Cir.1938), *cert. denied,* 305 U.S. 658, 59 S.Ct. 357, 358, 83 L.Ed. 426 (1939);[5] *see also W.T. Grant,* 699 F.2d at 609–10 (holding that, apart from constraints imposed by preference and fraudulent conveyance law, creditor may generally use its bargaining position to improve status of its existing claims).

 An exception to this general rule exists, however, when the lending institution exerts control over a debtor. There are two types of control: "de jure" control and "de facto" control. A structural analysis of the debtor will suffice to determine whether "de jure" control by the lender exists. *Boyd v.*

---

5. *Prima* is an old case, but there is nothing to call its vitality into question. Indeed, other courts have recently cited it with approval. *See, e.g.,* *Pinetree Partners,* 87 B.R. at 488–89; *In re Ludwig Honold Mfg., Co.,* 46 B.R. 125, 128 (Bankr. E.D.Pa.1985).

*Sachs (In re Auto Specialties Manufacturing Co.)*, 153 B.R. 457, 479 (Bankr.W.D.Mich. 1993); *see also In re Beverages International Ltd.*, 50 B.R. 273, 282 (Bankr.D.Mass.1985) ("Control of a corporation can be established by either stock ownership or the actual exercise of direction, management, or control"). An example of "de facto" control is the actual exercise of managerial discretion. *Auto Specialties*, 153 B.R. at 479–80.

■ Courts reason that a lender usurping the power of the debtor's directors and officers to make business decisions must also undertake the fiduciary obligation that the officers and directors owe the corporation and its creditors. *Heartland Chemicals*, 136 B.R. at 517; *Badger Freightways*, 106 B.R. at 977. This reasoning also dictates the scope of the term "control." What is required is operating control of the debtor's business, because only in that situation does a creditor assume the fiduciary duty owed by the officers and directors. *Heartland Chemicals*, 136 B.R. at 517; *see also Smith v. Associates Commercial Corp. (In re Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 701 (5th Cir.1990)).

Control does not exist simply because bargaining power was greatly skewed in favor of the lender because this will invariably be true wherever a debtor's primary lender is on the verge of terminating debtor's operations. *Auto Specialties*, 153 B.R. at 480. Control must be so overwhelming that there must be, "to some extent, a merger of identity." *Zimmerman v. Central Penn National Bank (In re Ludwig Honold Mfg. Co., Inc.)*, 46 B.R. 125, 128 (Bankr.E.D.Pa.1985). At least one court has described the conduct required as "a domination of [the debtor's] will." *In re Teltronics*, 29 B.R. at 170.

■ Loan documents themselves can establish control for the purposes of insider status. *See Fruehauf Corp. v. T.E. Mercer Trucking Co. (In re T.E. Mercer Trucking Co.)*, 16 B.R. 176, 189–90 (Bankr.N.D.Tex. 1981). A lender may be an insider if the lender "generally acted as a joint venturer or prospective partner with the debtor rather than an arms-length creditor [citations omit-

ted]." *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 500 (S.D.N.Y.1994).

■ In the present case, there is at least a question of material fact as to whether Leighton had sufficient control over the Debtor to warrant a finding that Leighton was an insider or a fiduciary. Facially, Leighton does not appear to have control over the Debtor. The Debtor's only general partner is KCDC, which itself is a corporate entity entirely owned and controlled by Mainstream. Because Mainstream controls KCDC, Mainstream controls Debtor. Leighton did not own any Mainstream securities and had no control over the voting stock of KCDC. Furthermore, Leighton did not own any limited partnership interest in the Debtor.

The inquiry does not end there, however, because Trustee alleges that the actions of McNab should be imputed to Leighton. McNab and Lakeside only owned 14% of Mainstream's outstanding voting securities. McNab and Lakeside—the partnership in which McNab was a general partner and in which the Trustee has alleged sufficient facts to suggest that Leighton, too, may have been a partner—owned, in the aggregate, less than 34% of the limited partnership interests of Debtor. Although McNab had no control over how KCDC's stock was voted, adding the ownership interests of Rios and Schabes to the interest held by Leighton, McNab, and Lakeside may have been sufficient to give the McNab Interests control over Mainstream. There is thus at least a question of material fact as to whether Leighton and the McNab Interests had or exercised control over the Debtor.

Certainly there is an issue of material fact sufficient to preclude summary judgment as to whether Leighton and McNab had "de facto" control over Mainstream and, by extension, the Debtor. Issues of material fact have been raised by the Trustee as to Leighton's and McNab's control over the Kids Creek Entities through the use of Rios and Schabes as designated insiders and control by the terms of the loan documents.[6]

**6.** The Trustee argues that de facto control was

also assumed by Leighton through the require-

The record regarding appointment of Rios and Schabes to serve as officers of Debtor points to such designation being made at the request of McNab. McNab admits he would not have become involved if Rios and Schabes were not, but denies having required their appointment. Groesbeck, however, states that McNab told him the appointment of Rios and Schabes were conditions of the loan.

Furthermore, Leighton expressly required Rios and Schabes to be associated with the Commons Development Project. LASA One expressly requires that Rios and Schabes be shareholder of Mainstream as a condition for the first advance. The Mainstream Shareholders Agreement prepared in contemplation of LASA One gave Rios and Schabes veto control over significant corporate actions, such as loans and guarantees. Rios and Schabes received this veto control despite the fact that they each only held 12.25% of Mainstream's outstanding shares.

However, there remains a genuine issue of material fact as to whether Rios and Schabes were working at the direction of McNab to protect the rights of Leighton and whether McNab and Leighton controlled Rios and Schabes. Leighton states that there is no evidence of any written or oral agreement between McNab, Rios and Schabes. While it is true Trustee has not provided any direct evidence of · such an arrangement, he did present circumstantial evidence (viewed for purposes of the instant motion most favorably toward Trustee) from which one may infer that such arrangement existed.

As movant, Leighton has the burden to show there is no genuine issue of material fact as to the existence of an arrangement or understanding between McNab, Rios, and Schabes. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Leighton was not able to establish this, in light of the circumstantial evidence submitted by Trustee. Leighton submitted affidavit statements by McNab, Rios, and Schabes that there was no such arrangement. However, conclusory statements in an affidavit are insufficient to support a summary judgment motion, especially where the statements pertain to information known only to the party making the statement. *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1380, n. 7 (10th Cir.1980). Indeed, if there were such an agreement between McNab and Rios, one would be surprised to see such an agreement in writing.

Leighton further argues that under principles of agency law there is no genuine issue of fact as to whether Rios and Schabes were doing McNab's will. Agency law, however, is not dispositive here. It might be sufficient to show that Rios and Schabes had an understanding, either written, oral, or implied, that they would protect Leighton's interests. The Trustee has presented sufficient evidence to establish a genuine issue as to whether Rios and Schabes were protecting Leighton's interests while they were officers of the Debtor.

Finally, there is a genuine issue of material fact as to whether Leighton was a joint venturer in the Commons and not just a lender to the Debtor. There is at least a genuine issue of material fact here as to whether Leighton's loans were capital contributions paid in exchange for equity interests. The Trustee has submitted evidence tending to show that no true "lender" would have loaned funds to the Kids Creek entities in early 1993. There were no prior operations on which to base funding requirements, no collateral, no income stream, and no capital assets whatsoever. There is also an issue of fact as to whether there was any capital

---

ments established in the loan documents for financing the project. Here the loan documents did not establish that level of control needed to find Leighton to be an insider, but did add to Leighton's control of Debtor.

LASA One, executed on February 18, 1993, granted Leighton a "right of first refusal as to future lending requirements" for the Project. This provision is significant because Groesbeck and McGhee apparently believed that it restricted their ability to obtain financing from entities other than Leighton, and required that Leighton could continue to dictate that Lakeside receive equity interests in the Project as conditions for funding. LASA Four permitted Leighton considerable influence over Debtor by establishing that substantial future project funding ($2 million) would come from him. Leighton actually exercised this right in connection with the Private Placement Offering in the summer of 1993.

whatsoever before funds were "loaned" by Leighton.[7]

If, as alleged, Leighton is a partner of Lakeside, Leighton owns equity interests in Debtor and Mainstream through its partnership interest. Significant equity interests in Debtor (34% by the end of 1993) and Mainstream were provided to Lakeside in conjunction with the parties' various agreements. As a result of the "loans," therefore, Leighton received significant equity, which suggests that Leighton was, in fact, a joint venturer in the Project and not merely a lender. Thus there is at least a genuine issue of material fact as to whether Leighton was a joint venturer with the Kids Creek entities in the Commons Project.

## B. Inequitable Misconduct

 Conduct can be characterized as inequitable if it arises out of one of the following categories: (1) fraud, illegality, breach of fiduciary duty; (2) undercapitalization; or (3) use of debtor as a mere instrumentality or alter ego. *Fluharty v. Wood Products, Inc. (In re Daugherty Coal Co., Inc.),* 144 B.R. 320, 324 (N.D.W.Va.1992); *Fabricators, Inc. v. Technical Fabricators, Inc.,* 126 B.R. 239, 247 (S.D.Miss.1989) (*citing In re Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206, 212 (5th Cir. 1983)). Inequitable conduct need not be directly related to the events giving rise to the claim. *Mobile Steel,* 563 F.2d at 700; *Daugherty Coal,* 144 B.R. at 324–25.

One type of inequitable conduct is when a party does not act in good faith.[8] *See, e.g., Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.,* 970 F.2d 273 (7th Cir.1992). In the *Original Great American Chocolate Chip Cookie* case, a Seventh Circuit panel found that, although two parties to a contract are not each other's fiduciaries, they are required

to act in good faith. *Id.* at 279–280. Therefore, any effort by either party to invoke contract provisions dishonestly to achieve a purpose contrary to that for which the contract had been made may be opportunistic behavior for which the law provides a remedy under some circumstances. *See Id.* at 281.

Facts have been sufficiently alleged and supported by the Trustee to show that there was a long time acquiescence in Debtor's breach of several loan covenants. There is an issue of fact as to whether this acquiescence of Debtor's defaults under the loan agreements was then used inequitably by Leighton to force Debtor into submission. The Trustee has also adequately shown that there is an issue of fact as to whether McNab sought to have $500,000 disbursed to Lakeside partners from the profits, after repayment of the loan to Leighton from the Medical Campus sale. This seems to have led to the souring of the relationship between Groesbeck and McNab. Thus, there is a genuine issue of fact as to whether Leighton decided to foreclose on the Master Lease, effectively strangling the Debtor because of its assertedly unreasonable request that the Debtor disburse $500,000 to Lakeside.

The Trustee alleges that McNab caused Leighton to stop funding the loan and issue default notices almost immediately after Debtor denied McNab's request to disburse funds to Lakeside Partners. The Trustee further alleges that, although McNab wanted a significant distribution of profits, Groesbeck and McGhee did not want to jeopardize continued development activities. The Trustee further alleges that McNab took steps to wrest complete control by threatening foreclosure unless Groesbeck relinquished whatever control he possessed.

---

7. There is also a dispute between the parties as to whether Murray and Sourlis contributed equity capital to the Commons Project, as evidenced by the Murray Litigation.

8. Another type of misconduct is advancing funds to a debtor when the debtor is undercapitalized. *See Daugherty Coal,* 144 B.R. at 326; *Blasbalg v. Tarro (In re Hyperion Enterprises),* 158 B.R. 555, 560–61 (D.R.I.1993). "Proof of undercapitaliza-

tion of a corporation may lead to equitable subordination if the claimant is an insider who makes a loan to the undercapitalized debtor." *Lifschultz Fast Freight,* 191 B.R. at 715; *see also, Braas Systems, Inc. v. WMR Partners (In re Octagon Roofing),* 157 B.R. 852, 857 (N.D.Ill.1993). This type of misconduct is discussed further below under the Court's discussion of converting debt to equity under the equitable subordination doctrine.

Leighton and McNab deny that either of them or the two together attempted to use their respective positions to wrest control from Groesbeck and McGhee. They claim that there is no genuine issue of fact as to the whether the loan agreements were breached, as to whether it acquiesced to such defaults for a period of time, and as to whether it used these defaults to ultimately seize all of Debtor's property. However, there is a genuine issue of material fact as to whether Leighton's assertion the Debtor had breached certain covenants constituted "inequitable behavior" for purposes of equitable subordination.

Leighton argues that it merely enforced its contractual right to foreclose on Debtor's property because Debtor had defaulted on a variety of negative and affirmative covenants. The Trustee argues that the Debtor was not in default of those covenants. However, at least two events of default have occurred. First, Debtor permitted Mainstream to pay compensation to Groesbeck, McGhee, Rios, and Schabes (although it is suggested that Groesbeck was unaware that LASA One forbade Mainstream from paying such compensation). Second, Debtor failed to provide financial statements to Leighton to enable Leighton to monitor its loan.

However, these and other alleged breaches of the loan agreements were not acted upon by Leighton for several months. This delay in foreclosing on the project is congruent with Trustee's theory that Leighton was a joint venturer who decided to enforce the form of a loan agreement when it was denied full control over distributions of the income stream. Thus, irrespective of whether Debtor was in actual breach of the loan agreements, the Trustee has raised issues of fact as to whether Leighton and McNab actually controlled the Kids Creek Entities and whether they attempted to use their rights granted in the loan agreements to force Debtor to shut down when Groesbeck would not acquiesce to their demands.

Because several questions of material fact remain with respect to Count I, summary judgment must be denied.

## Count II: Recharacterization of the Debt as Equity

In Count II of the First Amended Complaint, the Trustee alleges that Leighton knew that the Debtor and its affiliates had no excess capital and that Debtor needed capital to continue its operations. First Amended Complaint at ¶ 213. The Trustee further contends that McNab intended the McNab Interests to be equity participants in the Commons project, although the relevant agreements were characterized as "loans." First Amended Complaint at ¶ 215. He asserts that to accept the characterization of Leighton's contributions as "secured loans" would "elevate form over substance, to the manifest detriment of unsecured creditors of [the Debtor]."

In a case in which a creditor has contributed capital to a debtor in the form of a loan, but the loan has the substance and character of an equity contribution, the court may recharacterize the debt as equity regardless of whether other requirements of equitable subordination have been satisfied. See Diasonics, Inc. v. Ingalls, 121 B.R. 626, 630 (Bankr.N.D.Fla.1990). Such an approach to equitable subordination and recharacterization of loans allows for consistency with other areas of law in which the determination of status of debt or equity are important, such as under the tax code.

Courts apply several factors when determining whether a claim should be recharacterized as a loan or as a contribution to capital. See, e.g., Blasbalg v. Tarro (In re Hyperion Enterprises), 158 B.R. 555, 561 (D.R.I.1993); Diasonics, 121 B.R. at 631 n. 2; Jules S. Cohen, Shareholder Advances: Capital or Loans?, 52 Am.Bankr.L.J. 259, 264–65 (1978).

Most of the criteria have to do with whether the transaction bears the earmarks of an arm's-length bargain. These criteria include the intent of the parties, whether there was an agreement for repayment, provision for interest, a fixed maturity date, a note or other document evidencing the debt, entries of a loan on the parties' books, lack of subordination to other debts, actual partial repayment, restriction on

right to enforce collection, use of proceeds to acquire capital assets, loans proportionate to stock holdings, repayment to be made only from earnings, availability of outside financing, and enforcement of collection after default. The more the loans bear these earmarks of an arm's-length transaction, the more likely the courts are to treat the loans as loans and not capital investments.

*Shareholder Advances,* 52 Am.Bankr.L.J. at 264.

Additional factors include the timing of the advances, the amount or degree of the lender's control, and whether the ultimate financial failure was caused by undercapitalization. *Hyperion Enterprises,* 158 B.R. at 561; *Shareholder Advances,* 52 Am.Bankr.L.J. at 271–72. "[N]o one fact will result in the determination that putative loans are actually contributions to capital." *Fett v. Moore (In re Fett Roofing and Sheet Metal Co., Inc.),* 438 F.Supp. 726, 731 (E.D.Va.1977).

Also relevant to the inquiry into whether a debt should be recharacterized as equity is whether the debtor-corporation was undercapitalized. *Id.* at 265. *See also Diasonics,* 121 B.R. at 631 ("[s]hareholder loans may be deemed capital contributions in one of two circumstances: where the trustee proves initial undercapitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit."); *see also Hyperion Enterprises,* 158 B.R. at 560.

■ Advancing funds to undercapitalized debtors alone is insufficient for a finding of inequitable conduct. Other inequitable conduct must also be found for undercapitalization to constitute reason for equitable subordination, lest insiders and others shy away from lending to a corporation in financial distress. *See Braas Systems, Inc. v. WMR Partners (In re Octagon Roofing),* 157 B.R. 852, 858 (N.D.Ill.1993). "Any other analysis would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a floundering company." *Id.; see also In re Lemco Gypsum, Inc.,* 911 F.2d 1553, 1557 (11th Cir.1990).

■ Undercapitalization may play a role in a determination of inequitable conduct because it often accompanies insider misconduct. *Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.),* 622 F.2d 709, 717 (5th Cir.1980). For example, in the *Daugherty Coal,* the creditor not only advanced funds when the debtor was unable to obtain other financing, but also obtained security for the loan at that late date without going through appropriate formalities, in effect leap-frogging over the other creditors. *Daugherty Coal,* 144 B.R. at 327. Generally, the amount of capitalization that is adequate is "what reasonably prudent [people] with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of the incorporation of the now defunct enterprise [citation omitted]." *Mobile Steel,* 563 F.2d at 703; *see also Multiponics,* 622 F.2d at 717. Specifically, undercapitalization can be established by proof of either of two conditions: (1) insufficient initial capitalization to make a business similar to the debtor a viable business; or (2) inadequate capitalization to obtain equivalent advances from an informed outside lender. *Estes v. N. & D. Properties, Inc. (In re N. & D. Properties, Inc.),* 799 F.2d 726, 733 (11th Cir.1986); *Mobile Steel,* 563 F.2d at 703; *Daugherty Coal,* 144 B.R. at 325.

■ When determining whether either indicator of undercapitalization exists, the court is not bound by the actual characterization of the monetary advance as a loan. *Mobile Steel,* 563 F.2d at 702. "[S]o-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder ... where the paid-in-capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished as a loan." *Pepper,* 308 U.S. at 309–10, 60 S.Ct. at 246–47. Instead, the court should determine "whether equity requires that they be regarded as if they were something else," such as a capital contribution. *Id.* "Absolute measures of capital

inadequacy, such as the amount of stockholder equity or other figures and ratios drawn from the cold pages of the corporation's balance sheets and financial statements, are of little utility, for the significance of this data depends in large part upon the nature of the business and other circumstances." *Mobile Steel*, 563 F.2d at 702–03.

 There remains on the present record a question of fact (or mixed fact and law) as to whether the Debtor was undercapitalized. It is apparent from the pleadings that Groesbeck had been unable to obtain financing prior to Leighton's original commitment because the Debtor's potential lease or purchase in the Commons was merely speculative and the Debtor had no other assets. This suggests that the Debtor did not have sufficient capital. Furthermore, the Trustee alleges that the Kids Creek Entities were organized with the minimum amount of capitalization allowed by law. Leighton and McNab have asserted that they have no knowledge of whether the Debtor was undercapitalized and have presented no evidence suggesting that the Debtor was sufficiently capitalized at the time Leighton advanced funds to the Debtor. Leighton and McNab have, therefore, failed to meet their burden as movants of showing that no question of material fact exists and summary judgment with respect to Count II must be denied.

**Count III: Breach of Contract by Leighton**

 In Count III of the First Amended Complaint, the Trustee alleges that Leighton breached LASA Four when it refused to provide funds to the Debtor pursuant to that agreement. Leighton argues summary judgment should be granted on Count III because Trustee cannot recover lost profits as damages since the business did not have a track record of profits and cannot prove damages with any measure of certainty. In support of its proposition, Leighton cites *Stuart Park Associates Limited Partnership v. Ameritech Pension Trust*, 846 F.Supp. 701 (N.D.Ill.1994) (Alesia, J.)

In *Stuart Park*, a newly created "start-up" business without any financial track record or history of profits was formed for the purpose of developing a parcel of real property, which it had "under contract." *Id.* at 704–05. The developer sued a pension trust, claiming that the latter had breached a contract to fund the real estate development, thereby causing the developer to suffer damages in the amount of its lost future profits. *Id.* at 706. The pension trust moved for summary judgment, arguing that the developer was a "new business" without a sufficient business history to prove damages. *Id.* at 715.

The District Court granted summary judgment against the developer on its contract claim for lost profit reasoning that:

> It is undisputed that [the developer] was a "new business." Typically in Illinois, a new business cannot recover for lost profits [citation omitted], because damage calculations must be to a reasonable certainty [citation omitted]. If a business did not exist prior to the defendant's breach of contract, lost profits generally cannot be calculated to a reasonable certainty because the plaintiff cannot offer any figures with which to compare profits after the breach of the contract [citation omitted].

*Id.* at 715. The Seventh Circuit affirmed, holding that:

> We do not believe this ruling was error. Under Illinois law, a new business generally has no right to recover lost profits. This element of damages is recoverable only if the business was previously established [citation omitted]. The apartment complex was to be built on a barren piece of undeveloped land. No evidence demonstrated what, if anything, this particular venture would yield. Summit argues vehemently that its successes with other apartment buildings should be considered as probative of this essential fact. However, these are different pieces of real estate from different markets—not providing a self-evident basis for generalization [citation omitted].

*Stuart Park Associates Limited Partnership v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir.1995).

It is true that, like the *Stuart Park* venture, Debtor was a newly formed, single pro-

ject, "start-up" real estate development company without a financial track record at all, much less a history of profitable operations. Moreover, the Commons was unique from an architectural and historic perspective. Ordinarily, making any attempt to compare it to other projects by other developers is highly speculative.

In this particular case, however, some of the real estate was about to be sold to Munson and County. Neither party disputes that this sale was imminent when the Default Notice was sent and recorded on the Commons property. The Trustee pleads, however, that Leighton took action that interrupted the plan to sell, and that, as a result, the property was sold at an asserted discount from actual value. The Trustee thus seeks damages for the difference in value between the price debtor could have obtained by selling to Munson and County without Leighton's alleged breach of contract versus the price it actually received.

Since there was likelihood of the sale occurring when the contested action was taken, it cannot be said that damages for Leighton's alleged breach of contract cannot be determined. Trustee may be able to show damages equaling at least the difference between the sales price that could have been obtained by selling to Munson and County and the actual sales price following the asserted breach by Leighton. Therefore, there is a genuine issue of material fact, and summary judgment is denied as to Count III.

### Count IV: Breach of Fiduciary Duty by McNab

■ Count IV alleges that McNab was a fiduciary of the Debtor and breached his fiduciary duty. McNab denies that he was a fiduciary of the Debtor and argues that, even if he were a fiduciary of the Debtor, he breached no duties owed.

It is undisputed that McNab was a general partner of Lakeside. It is also undisputed that, after Leighton and the Debtor entered into LASA Four, Lakeside owned 32.88% of the limited partnership interests of the Debtor and 13% of the shares of Mainstream. Leighton & McNab 402.M Statement ¶ 11 and answer thereto. It is also undisputed that McNab owned .76% of the limited part-

nership interests of the Debtor and 1% of the shares of Mainstream. *Id.* As a result of these transactions, Lakeside owned the largest interest in Debtor, even greater than that of Groesbeck, who then owned only 26.14%. *Id.*

As a partner of the Debtor and a shareholder of Mainstream, Lakeside owed a measure of fiduciary duty to the other shareholders of the Debtor. Under Illinois law, all partners are fiduciaries for one another. *Bane v. Ferguson,* 707 F.Supp. 988, 996 (N.D.Ill.), *aff'd,* 890 F.2d 11 (7th Cir.1989). Likewise, a shareholder of a close corporation owes a duty of loyalty to the corporation and to the other shareholders. *Rexford Rand Corp. v. Ancel,* 58 F.3d 1215 (7th Cir. 1995) (*citing Hagshenas v. Gaylord,* 199 Ill. App.3d 60, 145 Ill.Dec. 546, 552, 557 N.E.2d 316, 323 (1990)). Shareholders must deal in good faith and transact business fairly, honestly, and openly with their fellow shareholders. *Rexford Rand,* 58 F.3d at 1218–19 (*quoting In re Dearborn Process Service, Inc.,* 149 B.R. 872, 880 (Bankr.N.D.Ill.1993)). This is because closely held corporations in many ways resemble partnerships in spite of their corporate form. *Rexford Rand,* 58 F.3d at 1219. "Thus, the mere fact that a business is run as a corporation rather than a partnership does not shield the business venturers from a fiduciary duty similar to that of true partners." *Id.* (*citing Hagshenas,* 145 Ill.Dec. at 552, 557 N.E.2d at 322).

By extension, McNab, as general partner and agent of Lakeside, would be responsible to uphold the fiduciary duties of the partnership. Lakeside is a general partnership under the laws of California. California has enacted the Uniform Partnership Act. Cal. Corp.Code § 15001 *et seq.* Pursuant to the Uniform Partnership Act, a partner may only act within the scope of his authority to carry on the business of the partnership. Cal. Corp.Code § 15009(1). The partner is then personally liable for any actions taken outside that scope of authority. Cal.Corp.Code § 15009(2). Thus, under general principles of partnership and agency law, McNab would have to uphold the fiduciary duties of Lakeside. If McNab caused a breach of Lakeside's fiduciary duties, as agent he might be

liable to Lakeside for any actions taken outside his scope of authority and liable as a partner to the Debtor for any actions taken within his scope of authority. *See* Cal.Corp. Code. § 15015.

The question then becomes whether any fiduciary duty was breached. The Trustee has alleged sufficient facts to at least create a question of material fact as to whether Leighton and McNab acted properly with respect to the foreclosure of the loan. Leighton initially threatened the Debtor with foreclosure approximately one month after its interest became fully secured with the mortgage on the Commons property. The Trustee has provided statements that indicate that Leighton had been informed of the debts to Camp and Sourlis, and, had McNab or another representative of Leighton read the financial statements submitted to Leighton, they would have been aware of the fact that the Debtor had obtained funds through other sources. Furthermore, if, in fact, Leighton merely objected to the fact that Camp could convert his debt into an equity interest, Leighton would have probably accepted Debtor's offer to rewrite the note to remove any conversion right. Instead, the Trustee alleges sufficient facts to suggest that Leighton only wanted more control over the project.

If these allegations are proven, the Court could well find a breach of fiduciary duty on the part of McNab. Thus, there remains a question of material fact sufficient to preclude summary judgment on Count IV.

### Count V: Breach of Fiduciary Duty by Rios

In Count V of the First Amended Complaint, the Trustee alleges that Rios had a fiduciary duty to Mainstream, to KCDC, and to Debtor (as a fiduciary to Mainstream and KCDC). The Trustee further alleges that Rios breached that duty. First Amended Complaint ¶¶ 415–421. Rios admits that he is a fiduciary of the Kids Creek Entities, but denies he has breached that duty. Rios Response to Trustee's Memorandum in Opposition to Motion for Summary Judgment, p. 7.

The Trustee alleges that Rios violated his fiduciary duty in connection with LASA One by authorizing the issuance of an 11.67% limited partnership interest in the Debtor to Lakeside Partners, knowing that the sole purpose for this was to increase the equity participation of the McNab Interests in the Commons Development Project. First Amended Complaint ¶ 422. The Trustee alleges that Rios knew this was contrary to the Debtor's best interest because this enabled Leighton to gain an equity interest while still maintaining its status as a "lender." In support of this contention, the Trustee has submitted statements by McNab indicating that Leighton was a partner in Lakeside. He has further submitted evidence, in the form of affidavits and deposition testimony, that at least creates a question of material fact as to whether McNab was operating as Leighton's agent and that Rios was in turn operating as McNab's agent from the time he made initial contact with Groesbeck and the Kids Creek Entities.

If Rios was in fact representing McNab and if McNab was in fact representing Leighton, these actions could be a breach of Rios' fiduciary duty to the Debtor and the other Kids Creek Entities. Therefore, a question of material fact exists as to whether Rios violated his fiduciary duty to the Debtor exists and summary judgment on Count V is denied.

### Count VII: Inducement to Breach Fiduciary Duties

In Count VII of the First Amended Complaint, the Trustee alleges that McNab induced both Rios and Schabes to breach their fiduciary duty to the Debtor. The Trustee alleges that McNab colluded with both Rios and Schabes to induce their respective breaches of duty to the Debtor and that he led them to believe that their complicity in the Commons project would inure to their respective benefit in connection with future unrelated business activities with McNab. First Amended Complaint at ¶ 559. The Trustee further alleges that McNab and the McNab Interests received substantial benefits as a result of Rios and Schabes breaches of their respective fiduciary duties to the Debtor. First Amended Complaint at ¶ 560.

■ Under Illinois law, a third party who knowingly participates in or induces a breach of duty by an agent is liable to the person to whom the duty was owed. *Salem Mills, Inc. v. Wisconsin Tool and Stamping Co. (In re Salem Mills, Inc.)*, 881 F.Supp. 1109, 1116 (N.D.Ill.1995); *Aluminum Mills Corp. v. Citicorp North America, Inc. (In re Aluminum Mills Corp.)*, 132 B.R. 869, 892 (Bankr. N.D.Ill.1991); *Corroon & Black of Illinois, Inc. v. Magner*, 145 Ill.App.3d 151, 161, 98 Ill.Dec. 663, 668, 494 N.E.2d 785, 790 (5th Dist.1986). "Thus, a party who encourages another to breach his fiduciary duties with the intent to obtain some benefit for himself is jointly and severally liable for the breach." *Aluminum Mills*, 132 B.R. at 892.

■ There remains a question of material fact sufficient to preclude summary judgment on Count VII. It is undisputed that McNab and Rios were "closest friends" and in constant contact throughout the relevant period. Furthermore, the Trustee has submitted numerous affidavits that suggest Rios was working as an agent for McNab from the beginning of his involvement in the Commons Development Project. Likewise, as already noted above, there is still a question of material fact as to whether Rios, in fact, breached his fiduciary duty to the Debtor. Viewing the facts in a light most favorable to the Trustee as non-moving party, it is still possible to show that McNab took advantage of his relationship with Rios and influenced him to breach his fiduciary duty to the Debtor. As such, summary judgment on Count VII is also denied.

## CONCLUSION

For the reasons stated herein, the motions of Defendants Leighton, McNab, and Rios are each denied.